**COMMONWEALTH of Pennsylvania**

v.

**Holly CRAWFORD, Appellant.**

Superior Court of Pennsylvania.

Argued Feb. 15, 2011.

Filed June 13, 2011.

Jeffrey A. Conrad, Lancaster, for appellant.

James L. McMonagle, Assistant District Attorney, Wilkes–Barre, for Commonwealth, appellee.

BEFORE: FORD ELLIOTT, P.J.E., PANELLA and FITZGERALD,* JJ.

OPINION BY FORD ELLIOTT, P.J.E.:

Holly Crawford appealed from a judgment of sentence entered in the Court of Common Pleas of Luzerne County following her conviction by a jury on the charges of cruelty to animals, 18 Pa.C.S.A. §§ 5511(a)(2.1)(i)(A) and (c)(1) in relation to attempts to turn three kittens into "gothic cats" by piercing their ears and necks as well as banding their tails. For the reasons set forth below, we find that appellant has failed to carry her burden of showing that the statute is unconstitutional and that the evidence was insufficient to support her convictions. Accordingly, we affirm the judgment of sentence.

The facts of this case are as follows. In December of 2008, Martin Mersereau ("Mersereau"), of the Cruelty Investigation Department of the People for the Ethical Treatment of Animals ("PETA"), was contacted regarding an advertisement on eBay for "gothic" kittens with piercings, alterations, and mutilations. (Notes of testimony, 2/1/10–2/3/10 at 145.) A picture of the six-week-old black kitten showed that it had 14 gauge barbell earrings in its ears which were flopped, a small submission ring[1] on the back of its neck, and a barbell earring on the end of

---

* Retired Justice specially assigned to the Superior Court.

1. A submission ring is a piercing used to hook things to, such as a leash or a chain. (*Id.* at

its docked[2] tail. (*Id.* at 151.) Upon further investigation, Mersereau discovered that appellant, a dog groomer, was selling the animals for $100. Additional photographs were emailed to Mersereau. Metal protruded from the kittens' small bodies, pierced through their ears and necks, and at least one of these kittens also had an elastic band tied around its tail, an attempt at docking, which is a procedure to stem the blood flow so that the tail eventually falls off. (*Id.* at 315.)

Mersereau forwarded the information to Amanda Kyle ("Kyle"), a field worker from the cruelty investigations unit of PETA. (*Id.* at 170, 191.) Kyle pretended to be interested in buying a kitten and went to the address provided, 71 Dobson Lane in Sweet Valley, Pennsylvania. (*Id.* at 192, 194.) Upon arrival, Kyle entered the residence through the basement where appellant's grooming business was located. Kyle was then escorted to the third floor of the house where she met appellant. (*Id.* at 192–193.) Here, Kyle saw the kittens described on eBay.

Four black kittens were on the floor; three had pierced ears, one had no tail, and one had a rubber band around its tail. Kyle testified that she did not see any puss or inflammation on the areas where the ears were pierced or the tails docked. Kyle noted that the three pierced kittens were not moving at all and were very docile, unlike normal kittens of similar age. (*Id.* at 195.) She noted a definite difference in the behavior of the pierced kittens versus the non-pierced kitten, who was engaging and moving around the room. (*Id.*)

Kyle noted that appellant had several facial piercings and was enthusiastic about piercing. Appellant told Kyle that she had just pierced her child for the first time. (*Id.* at 196.) Kyle took pictures and asked how the procedure was done to the kittens. (*Id.* at 196, 198.) Appellant admitted doing the piercings herself without anesthesia. (*Id.* at 196.) However, appellant did show Kyle the antiseptic that she used on the kittens' ears. (*Id.* at 221–222.) Appellant mentioned that the kittens had cried when she pierced them. In fact, one of the kittens had ripped out a piercing, and appellant admitted to re-piercing the ear. (*Id.* at 202–203.)

Appellant also described to Kyle how she banded the tail of one of the kittens to dock it. (*Id.* at 197.) Appellant stated that she had "rubber banded" the tail until it died and the tail then fell off. (*Id.*) Kyle noted that one of the kittens actually had a rubber band around its tail. Appellant noted that the tail was dead and that she expected it to fall off in "a week or so." (*Id.*) Appellant explained that when the tail fell off, she would pierce the nub. (*Id.* at 198.)

Kyle also observed that the ears of the kittens with piercings in them had folded over; the heavier earring used caused the ears to fold over which appellant used as a "selling point." (*Id.* at 201.) Appellant told Kyle that the kittens had not seen a vet and she had done the piercings and dockings because she thought it would be "neat." (*Id.* at 196, 203.)

The Luzerne County Society for the Prevention of Cruelty to Animals ("SPCA") was contacted. A search warrant was obtained and Officer Carol Morrison seized the kittens on December 17, 2008. (*Id.* at 235.) Appellant admitted to the SPCA that she had pierced and band-

---

313.) Mersereau also testified that he knew of the term in context of a sexual bondage fetish. (*Id.* at 151.)

2. Docking is a term for the intentional amputation of part of an animal's tail. (*Id.* at 131.)

ed the kittens. (*Id.* at 241, 248.) Officer Morrison noted that the kittens with piercings were listless and docile. (*Id.* at 249.) The kittens were taken to an emergency animal clinic and examined by a veterinarian, Dr. Donald Sankey ("Dr. Sankey").

Dr. Sankey testified to his examination of the animals and stated that three of the kittens had inappropriate piercings of the ears and/or scruff of the neck, one of the kittens had its tail docked, and another had a band around its tail in order to dock its tail. (*Id.* at 99–107.) Dr. Sankey stated that he believed the piercings were inappropriate because they served no function. (*Id.* at 100, 102.) The doctor also noted that banding is an inappropriate way to dock the tail of a cat. (*Id.* at 107.) He removed the piercings and the band, cleaned the wounds, and administered an antibiotic as some of the wounds were infected. (*Id.* at 109–110.) Dr. Sankey noted that the kittens were in generally good health. (*Id.* at 112–119.)

Dr. Melinda Merch ("Dr. Merch"), an animal cruelty investigator and veterinarian, was qualified as an expert in the field of veterinary forensic science. (*Id.* at 300.) Dr. Merch explained that the 14–gauge needle used to pierce the kittens is the type of needle used to give injections to cattle. (*Id.* at 302.) In her practice, she used a 25–gauge needle, a much smaller size, when giving injections to kittens. (*Id.*) The doctor also testified that the piercings would be a source of constant irritation and pain for the animals and could alter the kittens' hearing. (*Id.* at 305, 309.) If it became infected, it would hurt the cat anytime the ear moved. (*Id.* at 310.) As for the piercings at the scruff of the neck, Dr. Merch explained that a kitten would always feel like it was being dominated and bitten. (*Id.* at 312.) Dr. Merch testified that banding is never an accepted procedure, and the only appropri-

ate way to dock a tail is surgically with the aid of anesthesia. (*Id.* at 313–314, 358.) She opined that banding would be extremely painful to a kitten as there are spinal nerves in the part of the tail where the band was placed. (*Id.* at 316.) Putting a 14–gauge needle in the docked tail would make the pain worse. Lastly, she opined that the kittens were maimed, disfigured, and tortured. (*Id.* at 321–322.)

The jury convicted appellant of one count of animal cruelty pursuant to 18 Pa.C.S.A. § 5511(a)(2.1)(i)(A) and acquitted her of the two remaining counts. The Honorable Tina Polachek Gartley found appellant guilty of one count of summary animal cruelty pursuant to 18 Pa.C.S.A. § 5511(c)(1) and, consistent with the jury's determination, acquitted her of the remaining two counts. On April 12, 2010, Judge Gartley sentenced appellant to one year of intermediate punishment, with the first six months to be served on electronic home monitoring, followed by a consecutive year of probation for the misdemeanor, and a 90–day period of consecutive probation for the summary offense. (Notes of testimony, 4/12/10 at 47–49.)

Appellant filed a post-sentence motion challenging the sufficiency and the weight of the evidence. The motion was denied on May 12, 2010. Thereafter, on June 10, 2010, appellant filed a timely notice of appeal. The trial court directed appellant to file a concise statement of errors complained of on appeal and appellant timely complied. The trial court has filed a Rule 1925(a) opinion in response. Herein, appellant raises two issues for our review:

1. Whether 18 Pa.C.S.A. § 5511(a)(2.1)(i)(A) and 18 Pa.C.S.A. § 5511(c)(1) are unconstitutionally vague and violate Appellant's Due Process rights under the Fifth Amendment of the United States' Constitution as applied to the states

by the Fourteenth Amendment and Article 1, § 9 of the Pennsylvania Constitution?

2. Whether the evidence presented at trial was insufficient to sustain a conviction for animal cruelty where the Commonwealth failed to produce evidence that the Appellant acted willfully and maliciously?

Appellant's brief at 4.

■ In her first argument, appellant posits that the cruelty to animals statute is unconstitutionally vague, and therefore, the statute violated her due process rights. Specifically, appellant contends that the statute is ambiguous as it does not give sufficient notice that docking a kitten's tail and piercing a kitten's ears are prohibited actions. (Appellant's brief at 11.)

■ The constitutionality of a statute is a question of law; therefore, the scope of appellate review is plenary. *Commonwealth v. Moss*, 852 A.2d 374, 379 (Pa.Super.2004). "The constitutional validity of duly enacted legislation is presumed. The party seeking to overcome the presumption of validity must meet a formidable burden." *Commonwealth v. Haughwout*, 837 A.2d 480, 487 (Pa.Super.2003), citing *Commonwealth v. Means*, 565 Pa. 309, 773 A.2d 143 (2001). "A statute will not be declared unconstitutional unless it clearly, palpably, and plainly violates the Constitution; all doubts are to be resolved in favor of a finding of constitutionality." *Commonwealth v. Mayfield*, 574 Pa. 460, 466, 832 A.2d 418, 421 (2003) (internal citations and quotation marks omitted).

■ This court set forth the standards for evaluating a vagueness challenge as follows:

Due process demands that a statute not be vague. A statute is vague if it fails to give people of ordinary intelligence fair notice as to what conduct is forbidden, or if they cannot gauge their future, contemplated conduct, or if it encourages arbitrary or discriminatory enforcement. A vague law is one whose terms necessarily require people to guess at its meaning. If a law is deficient—vague—in any of these ways, then it violates due process and is constitutionally void.

By contrast, to be valid, a penal statute must set forth a crime with sufficient definiteness that an ordinary person can understand and predict what conduct is prohibited. The law must provide reasonable standards which people can use to gauge the legality of their contemplated, future behavior.

At the same time, however, the void for vagueness doctrine does not mean that statutes must detail criminal conduct with utter precision. Condemned to the use of words, we can never expect mathematical certainty from our language. Indeed, due process and the void for vagueness doctrine are not intended to elevate the practical difficulties of drafting legislation into a constitutional dilemma. Rather, these doctrines are rooted in a rough idea of fairness. As such, statutes may be general enough to embrace a range of human conduct as long as they speak fair warning about what behavior is unlawful. Such statutes do not run afoul of due process of law.

*Commonwealth v. Habay*, 934 A.2d 732, 737 (Pa.Super.2007) (citations, brackets, emphasis, and ellipses omitted), *appeal denied*, 598 Pa. 746, 954 A.2d 575 (2008). Appellant does not raise a challenge of facial vagueness as her claim does not concern the First Amendment. Therefore, we turn to the statute as applied to appellant's conduct. *See id.*

The applicable statutes at issue are as follows:

§ 5511. Cruelty to animals

(a) Killing, maiming or poisoning domestic animals or zoo animals, etc.—

(2.1)(i) A person commits a misdemeanor of the first degree if he willfully and maliciously:

(A) Kills, maims, mutilates, tortures or disfigures any dog or cat, whether belonging to himself or otherwise. . . .

18 Pa.C.S.A. § 5511(a)(2.1)(i)(A).

(c) Cruelty to animals.—

(1) A person commits an offense if he wantonly or cruelly illtreats, overloads, beats, otherwise abuses any animal, or neglects any animal as to which he has a duty of care, whether belonging to himself or otherwise, or abandons any animal, or deprives any animal of necessary sustenance, drink, shelter or veterinary care, or access to clean and sanitary shelter which will protect the animal against inclement weather and preserve the animal's body heat and keep it dry.

18 Pa.C.S.A. § 5511(c)(1).

Again, appellant's claims center on her premise that a person of normal intelligence would not know whether piercing a kitten's ears or banding its tail is maiming, mutilating, torturing, or disfiguring an animal.[3] We disagree.

When words are not defined in a statute, the Pennsylvania Statutory Construction Law instructs that terms should be construed in accordance with their common or approved usage. *See* 1 Pa.C.S.A. § 1903. The words in the statutes appellant stands convicted of are well-known in the law and according to their common and approved usage. The following are the definitions of the applicable prohibited actions of the statutes, as defined by *Merriam–Webster's Online Dictionary:*

**Maim**

1: to commit the felony of mayhem upon

2: to mutilate, disfigure, or wound seriously

**Mutilate**

1: to cut up or alter radically so as to make imperfect

2: to cut off or permanently destroy a limb or essential part of: cripple

**Torture**

1: a: anguish of body or mind: agony b: something that causes agony or pain

2: the infliction of intense pain (as from burning, crushing, or wounding) to punish, coerce, or afford sadistic pleasure

3: distortion or overrefinement of a meaning or an argument: straining

**Disfigure**

1: to impair (as in beauty) by deep and persistent injuries

2: obsolete: disguise

Additionally, as to Section (a)(2.1)(i)(A), the terms "willfully and maliciously" are clearly defined in the law. "Willful" conduct is the same as "knowing" conduct according to 18 Pa.C.S.A. § 302(g). The Crimes Code defines "knowingly" as follows:

A person acts knowingly with respect to a material element of an offense when: (i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and (ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

---

**3.** It is conceded that the term "kill" is not involved in the instant set of facts.

18 Pa.C.S.A. § 302(b)(2). "Malicious" conduct is conduct that represents a "wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty." *Commonwealth v. Ingram,* 926 A.2d 470, 476 (Pa.Super.2007), quoting *Commonwealth v. Hackenberger,* 795 A.2d 1040, 1044 (Pa.Super.2002), *affirmed,* 575 Pa. 197, 836 A.2d 2 (2003).

The culpability requirement of Section 5511 is wantonness or cruelty. *Commonwealth v. Tomey,* 884 A.2d 291, 294 (Pa.Super.2005), *appeal denied,* 588 Pa. 781, 906 A.2d 542 (2006). The words "wanton" and "cruel" are to be construed according to their common and approved usage. *Id.* at 295. In *Tomey,* this court approved of the following definition of "wanton":

> Wanton misconduct means that the actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or so obvious that he must be taken to have been aware of it and so great as to make it highly probable that harm would follow. It usually is accompanied by a conscious indifference to the consequences.

*Id.* "Cruel," in its common usage, is defined as "disposed to inflict pain or suffering," "devoid of humane feelings," "causing or conducive to injury, grief, or pain," and "unrelieved by leniency." *Merriam–Webster's Online Dictionary.*

We do not agree with appellant that the particular words complained of are vague when considered in the context of the statutes and with a view to effectuating the purpose of the acts—prevention of the cruelty to animals. Much of the law against animal cruelty can be summed up in the phrase "common sense" and such is the case herein. The fact that specific acts of maiming, mutilation, torture, and disfigurement are not enumerated, a difficult task at best, does not render the statutory standard void for vagueness. Criminal laws are not "vague" simply because the conduct prohibited is described in general language. There are an infinite number of ways in which the callously indifferent can subject animals in their care to conditions which make one cringe. It is thus impossible for the Legislature to catalog every act which violates the statute. Nonetheless, the terms "maim," "mutilate," "torture," and "disfigure" all give fair notice of an objective standard of reasonableness in the avoidance of infliction of suffering. The notice component of due process does not require any more. Thus, appellant's acts of piercing the kittens' ears and scruff with a needle commonly used to inject cattle as well as docking their tails by use of a rubber band seems to obviously come within the language of the statute.

Appellant attempts to sway this court by arguing that cats and dogs are similar. Appellant contends that actions such as declawing a cat or cutting a dog's vocal cords are accepted actions that could also be argued as acts that maim, mutilate, torture, or disfigure the animal. (Appellant's brief at 11.) Appellant's argument is not persuasive. First, while dogs and cats are both domesticated, they are completely different animals. Additionally, there is a legally acceptable way to perform the aforementioned medical procedures. *See, e.g.,* 18 Pa.C.S.A. § 5511(h)(2)(i) and (ii) (relating to the procedure of debarking a dog). As the Commonwealth notes, declawing a cat with a pair of pliers without anesthesia would be an inappropriate action and would constitute torture and the infliction of intense pain. Again, this court does not believe that the statute is so vague that one would be unaware that the conduct at issue is unlawful.

Appellant also presents this court with an analogy of piercing a child's ears and posits that such action is not uncommon in

our society and is not done to "torture, mutilate, maim, disfigure, illtreat, abuse or otherwise neglect the child." (Appellant's brief at 12.) She suggests that a person of common intelligence is in a dilemma since one could not discern that piercing a kitten's ear is prohibited conduct when piercing a child's ear is permitted. No such comparison can be warranted. As the Commonwealth notes, people of common intelligence know that the ear of a human child and that of a kitten are entirely different.

In fact, testimony was presented regarding the difficulties that could arise from piercing a kitten's ear. Dr. Merch explained that a cat's ear is sensitive and essential as it serves two functions: to capture sound and to communicate in a non-verbal fashion. (Notes of testimony, 2/1/10–2/3/10 at 305, 310.) The doctor provided the example of when a cat folds its ears down to communicate to another animal by looking "menacing." (*Id.* at 310.) Thus, the action of piercing could permanently damage it and qualifies as mutilation, which is prohibited by statute. Piercing a child's ear does not lead to the same consequences. Further, as the prosecutors argued along with testimony from Dr. Merch, cats, unlike humans, simply cannot cope with body piercings; that the tools and approaches used by appellant were hideous; and that the kittens suffered terribly. For instance, Dr. Merch testified as follows:

Kittens—cats in general are fastidious groomers. They constantly groom themselves. A lot of that is their instinct to reduce their scent for hunting so they're not smelled. They're always cleaning … And they don't like anything on them or certainly in them. So having those piercings on their ears and behind their neck and at the tail, they would be constantly trying to get it out. It would be a constant source of irritation, pain, and they would never—they would always be trying to get it out.

*Id.* at 304–305. Additionally, the weight of the piercing caused the ears to fold over and created hearing issues and grave discomfort that prompted one kitten to work so hard to get rid of the earring that the ear was ripped. Appellant admittedly then re-pierced the ripped ear. (*Id.* at 202, 310–311.)

Appellant also takes the stance that she was unaware that docking the kittens' tails violated the statute. She claims that since docking a dog's tail is acceptable if done according to the statute, she could not know that docking a kitten's tail is prohibited. (Appellant's brief at 13–14.) Again, we disagree with any analogy appellant makes between cats and dogs. Appellant points to a breed of cat, the manx, which has a docked tail to enhance its aesthetic. Here, appellant was admittedly attempting to transform the kittens into a type of animal that does not exist—a "gothic" kitten.[4] Clearly, appellant's conduct in at-

---

4. "Gothic," as defined by *Merriam–Webster's Online Dictionary,* is an adjective used to describe the following:

  1.  a: of, relating to, or resembling the Goths, their civilization, or their language
     b: teutonic, germanic
     c: medieval
     d: uncouth, barbarous
  2.  a: of, relating to, or having the characteristics of a style of architecture developed in northern France and spreading through western Europe from the middle of the 12th century to the early 16th century that is characterized by the converging of weights and strains at isolated points upon slender vertical piers and counterbalancing buttresses and by pointed arches and vaulting b: of or relating to an architectural style reflecting the influence of the medieval Gothic
  3: often not capitalized: of or relating to a style of fiction characterized by the use of

tempting to transform a kitten in such a manner is prohibited.

Shockingly, appellant takes issue with the testimony that the kittens were tortured due to the chronic pain they suffered by the feeling of domination and the chronic pain suffered from the tail docking method employed. (Appellant's brief at 12–13.) Appellant argues that "chronic pain" does not satisfy the definition of torture stated in *Commonwealth v. Pursell*, 508 Pa. 212, 495 A.2d 183 (1985). *Pursell* defines torture, in part, as infliction of a considerable amount of pain and suffering which is unnecessarily atrocious. *Id.* at 239, 495 A.2d at 196. "Atrocious" is defined, in part, as extremely wicked, brutal, cruel, or barbaric. *Merriam–Webster's Online Dictionary.* Certainly, putting a rubber band around the tail of a kitten to cut off the circulation of blood to cause the tail to fall off or the action of putting a large needle, used to inject cattle, into the ear or neck of a three pound kitten would qualify as atrocious. The court is very mindful that animals are living creatures that feel pain and experience suffering.

Based on the foregoing, 18 Pa.C.S.A. § 5511(a)(2.1)(i)(A) and 18 Pa.C.S.A. § 5511(c) are not impermissibly vague on the grounds argued by appellant. Therefore, appellant is not entitled to relief on her first claim.

■ The next issue presented for our review is whether the evidence was insufficient to support her conviction for cruelty to animals under Section 5511(a)(2.1)(i)(A). Appellant claims the Commonwealth failed to establish that she had the *mens rea* required for this crime. (Appellant's brief at 16.)

■ Our standard of review when evaluating a sufficiency of the evidence claim is as follows:

> In determining whether the evidence was sufficient to support a defendant's conviction, we must review the evidence admitted during the trial along with any reasonable inferences that may be drawn from that evidence in the light most favorable to the Commonwealth as the verdict winner. If we find, based on that review, that the jury could have found every element of the crime beyond a reasonable doubt, we must sustain the defendant's conviction.

*Commonwealth v. Janda*, 14 A.3d 147 (Pa.Super.2011), quoting *Commonwealth v. Daniels*, 999 A.2d 590, 594 (Pa.Super.2010).

Upon consideration of the record in the light most favorable to the Commonwealth, we find the evidence was sufficient to sustain the conviction. Appellant focuses her argument on the claim the evidence is insufficient for finding she acted willfully and maliciously. In addressing a similar challenge to a cruelty to animals conviction, this court in *Hackenberger, supra,* reiterated the definition of malice:

> Malice exists where there is a "wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured." Where malice is based on a reckless disregard of consequences, it is not sufficient to show mere recklessness; rather, it must be shown the defendant consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily injury. A defendant must display a conscious disregard for almost certain death or injury such

desolate or remote settings and macabre,      mysterious, or violent incidents

that it is tantamount to an actual desire to injure or kill; at the very least, the conduct must be such that one could reasonably anticipate death or serious bodily injury would likely and logically result.

*Hackenberger*, 795 A.2d at 1044, citing *Commonwealth v. Kling*, 731 A.2d 145, 147–148 (Pa.Super.1999), *appeal denied*, 560 Pa. 722, 745 A.2d 1219 (1999) (citations omitted).

Appellant avers that the only evidence the Commonwealth presented to establish that she acted willfully or maliciously is the testimony of Kyle that appellant had stated she thought piercing the animals was "neat." (Appellant's brief at 17.) Appellant claims that no other reference is made to her intent throughout the proceedings. We disagree.

■ The Commonwealth is not required to depend upon proof by direct evidence, but may also meet its burden by circumstantial evidence alone.

A state of mind by its very nature is subjective; a person's mind cannot be opened so that his or her intent can be observed. In the absence of a declaration disclosing a person's intent, therefore, one can only look to the conduct and the circumstances surrounding it to determine the mental state which occasioned it.

*Commonwealth v. Wright*, 289 Pa.Super. 399, 433 A.2d 511, 513 (1981) (quotation and citation omitted).

The evidence at trial was plainly sufficient to prove appellant's intent under this section. The Commonwealth presented testimony from Dr. Sankey that the piercings were inappropriate as they served no function. The doctor also noted appellant's method of docking the kittens' tails was inappropriate. As stated, Dr. Merch's expert testimony was presented that the needle used was typically used to inject cattle and was much too large to use on a kitten. The expert stated that the piercings would be a constant source of irritation to the animals and that the banding was extremely painful to the kittens as well. Dr. Merch provided that in her expert opinion, the kittens were maimed, disfigured, and tortured.

As the trial court notes, appellant freely admitted to using a 14–gauge needle, a size used to inject cattle, to pierce the ears and scruff of the neck of a three-pound kitten without the aid of anesthesia. Appellant also told Kyle that the kittens cried when being pierced. Appellant's admission that she thought it would be "neat" to pierce the kittens demonstrates that her actions were willful and were not for a legitimate good-faith purpose. We find the Commonwealth presented sufficient evidence of appellant's *mens rea*.

Judgment of sentence affirmed.