J-S31030-15

2015 PA Super 121

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| ELIZABETH SHICKORA, | |
| Appellant | No. 1550 MDA 2014 |

Appeal from the Judgment of Sentence entered August 19, 2014,
in the Court of Common Pleas of Schuylkill County,
Criminal Division, at No(s): CP-54-SA-0000041-2014

BEFORE:  BENDER, P.J.E., ALLEN, and WECHT, JJ.

OPINION BY ALLEN, J.:                            **FILED MAY 21, 2015**

Elizabeth Shickora ("Appellant") appeals from the judgment of sentence imposed after the trial court heard her summary appeal *de novo*, and convicted her of eighteen (18) counts of cruelty to animals, 18 Pa.C.S.A. § 5511(c).  Finding that the trial court acted within its province in concluding that Appellant acted wantonly by "unreasonably risking harm while being utterly indifferent to the consequences", we affirm.

The trial court accurately recounted the evidence of record as follows:

> At the hearing, Sergeant Duane Frederick ("Frederick") testified a neighbor of [Appellant's] contacted the Rush Township Police department on the evening of December 9, 2013 regarding the animals at [Appellant's] home.  At 9:00 AM on December 10, 2013, Frederick arrived at the home, and [Appellant] allowed him to enter.  Frederick found the home conditions to be horrendous, one of the worst he had ever seen.  The floor was covered with animal feces, as were the carpeting and walls.  There were numerous dogs in cages, and feces was on the dogs and

cages. The dogs were all barking and it was chaos. Frederick backed out of the home and advised [Appellant] that he was going to call the Society for the Prevention of Cruelty of Animals ("SPCA") because he needed more manpower in the situation. [Appellant] told Frederick she did not want her animals killed by the SPCA, and refused to allow Frederick back into her home. [Appellant] was now outside of her home, and told Frederick it was her house and to get off her property. Frederick accordingly left, verified that [Appellant] was the property owner on the Schuylkill County Parcel Locator, and obtained a search warrant. Frederick returned to the home later that day, and by that time, several SPCA employees had arrived, had spoken to [Appellant], and [Appellant] had allowed them to enter the home and remove the animals one at a time. After the animals were secured, Frederick issued eighteen citations and left.

Frederick testified that during the incident, [Appellant] informed him that she was elderly and in poor health, and had been in the hospital weeks prior. Frederick testified that [Appellant] had control of the house, and he did not believe that she tried to remedy it. Frederick did not believe that [Appellant] intended for the conditions to get that bad, but they did. Frederick stated that [Appellant] did not think the home condition was a problem. Frederick stated the home conditions were "out of control" and had built up over a long time.

Next, Janice Choplick ("Choplick") testified. She is the Humane Officer for Hillside SPCA in Pottsville, Pennsylvania. She received a phone call from Frederick asking the SPCA to respond and assist. They arrived at [Appellant's] home in the early afternoon of December 10, 2013. They spoke with [Appellant] and asked her to allow them to help. [Appellant] allowed them into the home. They saw many dogs, several to a crate. The dogs were covered in feces. The smell and the presence of urine were overpowering. The house was filled with dogs, some of which were running around. Choplick told [Appellant] that they would help her but they needed more manpower. [Appellant] who remained in the doorway told them to take a particular dog out with them, which they did. They called for two more helpers.

The first time in the house, Choplick did not observe any food or water. The second time in, she observed a bowl. The house was filthy, dirty, cluttered and full of junk. In her opinion it was not fit for human or animal habitation. The dogs were infested with fleas, had matted hair, eye problems and long nails. Choplick attempted to talk with [Appellant] about the animals' condition, but [Appellant] did not want to hear what Choplick had to say and nothing Choplick said mattered.

On cross examination, Choplick stated that she did not speak to [Appellant] about [Appellant]'s health issues, and did not know [Appellant] had been in the hospital. Choplick believed that the animals' and home's condition violated the law. She testified that it was difficult to tell whether the animals were malnourished because of the matting of their fur. The dogs looked to her to be in poor condition. All of the dogs received veterinary treatment upon arrival at the SPCA. Choplick testified that if in fact someone had been coming to the home to take care of the animals, it had not been recently.

Next, S[PC]A worker Maureen Graf ("Graf") testified. She has been with the Hillside SPCA for fourteen years and often works with Choplick. She went with Choplick to [Appellant's] residence. [Appellant] also let Graf in. Graf testified that the floor of the home was covered with feces, as were the boxes and crates housing the animals. The smell of urine was strong. The dogs had matted hair and were in poor condition. They were not healthy.

Graf took six photographs. She identified 1A as a crate taken from the home containing two dogs, which was brown because it was covered in feces. She testified that everything in the home was covered in feces. Photograph 1B was of the cat, which was found in a cage in the basement. The crate was covered with feces, cat hair and filled with cat food cans. The cage had not been cleaned for a long time.

Photograph 1C shows the same crate as photograph 1A, but with a dog inside. Photograph 1D shows an empty crate inside the home that was under the kitchen table, on a floor covered in feces. The crate was also covered in feces. Photograph 1E depicts the kitchen floor leading to

the back door, showing a small path and the floor covered with feces and trash. Finally, photograph 1F shows the cat in the cage, with feces and hair caked on the shelf above the litter box. Graf testified that they were able to save the cat.

Graf testified that she saw one bowl of food for the animals the second time she entered the home.

Graf testified that [Appellant] was cooperative when they first came into the home, and gave them one of the dogs to take. After that, [Appellant] refused to allow them to take any more animals until Frederick had a search warrant. Graf did not speak to [Appellant] about her health conditions. Graf testified that the home conditions were not suitable for habitation. Graf had no prior dealings with [Appellant] and has handled cruelty cases for Hillside SPCA for two to three years. Graf testified that they took all of the animals from the home and returned the crates. She took the photographs after Frederick returned with the search warrant. The dogs were all on the first floor of the home and the cat was in the basement. Graf testified that while she did not believe the conditions to be intentional, they were definitely evidence of neglect.

At this point in the hearing, defense counsel stipulated to the conditions of the home and the animals. The Commonwealth called another SPCA worker to the stand, who was also at [Appellant's] home on December 10 and made the same observations.

Finally, Hillside SPCA worker Tina Rowland ("Rowland") testified. She oversees medical treatment for animals at Hillside and was also present at [Appellant's] home and helped to inspect and remove each animal from the home. Rowland prepared a report form for each animal indicating what treatment it received at Hillside. Treatment included bathing, worming, for flea infestation, vaccines and grooming. All of the animals had worms. Some needed tooth removal and lump removals. [Appellant] signed a release transferring ownership of the animals to the SPCA and allowing the SPCA to provide medical care to the animals. The release and one of the reports were admitted into evidence.

- 4 -

Rowland testified that she offered to provide food and medical treatment for [Appellant] herself, who talked to Rowland about her health situation. [Appellant] refused all offers of help. Rowland testified that she was very concerned about the home conditions and that it was extremely unhealthy to live there and not safe to breathe. Rowland stated that at first, [Appellant] was cooperative and gave her information about each animal, recognizing she could not care for them. Then, when Frederick returned with the search warrant, [Appellant] refused to supply any further information.

After the Commonwealth rested, the defense called Frederick back to the stand. He testified that after he went into the home and saw the conditions, he admitted he was a germ freak, and called the fire department to get a protective suit. He believed that [Appellant] initially allowed him in until Frederick visibly displayed his physical reaction to the conditions in the home, after which [Appellant] denied permission to enter. The search warrant was issued at 2:00 PM, and Frederick probably returned to [Appellant's] home around 4:00 PM. When he returned, [Appellant] was seated in the living room on a chair speaking to someone on the telephone. She then began yelling at Frederick, claiming he was touching her and yelling "ow" into the phone. Frederick denied that he touched [Appellant]. He left an inventory of what the SPCA took on a table.

Next, Joy Kroening ("Kroening") testified. She has known [Appellant] for twenty years, through buying, selling and breeding dogs. She was the person on the other end of the telephone with [Appellant] on December 10, 2013. She also testified that she was in the home constantly prior to December 10, 2013, and in particular on December 7, 2013. She described the condition as "fine" and left food and water in bowls all over the home. She was in a hurry that day, and could have cleaned up some of the cans, but did not see any fleas. She testified that [Appellant] was in the hospital the week prior, and that Kroening and others helped to take care of [Appellant's] animals.

Kroening was unable to positively identify any of the photographs as having been taken in [Appellant's] home.

- 5 -

Kroening did not believe that the pictures were of [Appellant's] home. We did not find her testimony to be credible.

Finally [Appellant] testified that she had been in and out of the hospital during November of 2013. She got out of the hospital on December 8, 2013. She had people helping her to take care of the animals. We limited [Appellant's] testimony about her medical condition because it was not relevant. We agreed that given her medical condition, she had a limited ability to take care of her home and her animals. She testified that although she is currently in a wheelchair, on December 10, 2013 she was ambulatory. She also testified that Kroening was there to take care of the animals on December 10, 2013. At the conclusion of the trial, we found her guilty on all 18 counts of cruelty to animals.

Trial Court Opinion, 11/6/14, at 2-8.

The trial court sentenced Appellant to "pay fines, surcharge(s) and costs originally imposed by the District Justice on each of the 18 separate counts." Order/Sentence-Summary Offense, 8/19/14.

Appellant appealed on September 17, 2014. The trial court ordered compliance with Pa.R.A.P. 1925(b) the next day. Appellant filed her concise statement on October 2, 2014. The trial court filed an opinion on November 6, 2014.

Appellant presents a single issue for our review:

1. Did the Commonwealth fail to prove [Appellant] acted wantonly and cruelly to be convicted of cruelty to animals based on neglect?

Appellant's Brief at 4.

Appellant challenges the sufficiency of the evidence. Citing *Commonwealth v. Simpson*, 832 A.2d 496 (Pa. Super. 2003), and Black's Law Dictionary, Appellant asserts that "the testimony does not support the appellant having a state of mind of wantonness as defined as an unreasonable or malicious risking of harm while being utterly indifferent to the consequences." Appellant's Brief at 9. Appellant maintains that "taking the evidence in the light most favorable to the [C]ommonwealth there is no testimony of [A]ppellant's intentional and malicious actions towards the animals or recklessness with utter indifference to the consequences." *Id*. at 10. We disagree.

Where a trial court has heard a case *de novo*, our standard of review is limited to a determination of whether the court "committed an error of law or abuse of discretion, and whether the findings of the trial court are supported by competent evidence." *Commonwealth v. Tomey*, 884 A.2d 291, 293 (Pa. Super. 2005) (citation omitted). When evaluating claims challenging the sufficiency of the evidence to support a conviction,

> we review the evidence admitted at trial, along with any reasonable inferences that may be drawn from that evidence, in the light most favorable to the verdict winner. A conviction will be upheld if after review we find that the [fact-finder] could have found every element of the crime beyond a reasonable doubt. We may not weigh the evidence or substitute our judgment for that of the fact-finder. The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. 'Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances.' The Commonwealth

may prove each element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Furthermore, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact, while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part, or none of the evidence.

*Id*.

Appellant was convicted under 18 Pa.C.S.A. § 5511(c)(1), which reads:

A person commits an offense if he wantonly or cruelly illtreats, overloads, beats, otherwise abuses any animal, or neglects any animal as to which he has a duty of care, whether belonging to himself or otherwise, or abandons any animal, or deprives any animal of necessary sustenance, drink, shelter or veterinary care, or access to clean and sanitary shelter which will protect the animal against inclement weather and preserve the animal's body heat and keep it dry.

Appellant cites *Commonwealth v. Simpson*, 832 A.2d 496, 500 (Pa. Super. 2003), where we stated that "the Commonwealth must prove that a defendant acted wantonly and cruelly to be convicted of cruelty to animals based on neglect." In *Simpson*, the trial court had determined that the appellant's actions "were not wanton or cruel", such that this Court, on appeal, reversed the appellant's conviction. In *Simpson*, although we referenced Black's Law Dictionary, we stated that we "need not define 'wanton and cruel,' or set forth the type of conduct which would be considered wanton and cruel, because in this case the [trial] court found that Appellant did **not** act wantonly or cruelly." *Id*. We nonetheless advised:

- 8 -

> We do note that the definition of wanton and cruel within the meaning of Section 5511(c) should be construed according to their 'common and approved usage.' 1 Pa.C.S.A. § 1903(a). *Black's Law Dictionary* (7th Ed. 1999) defines 'cruelty' as 'the intentional and malicious infliction of mental or physical suffering on a living creature, esp. a human.' *Id*. at 384. 'Wanton' is defined as 'unreasonably or maliciously risking harm while being utterly indifferent to the consequences.' *Id*. at 1576. Wantonness may be properly understood to be recklessness with utter indifference to the resulting consequences. *Id.,; see also, Commonwealth v. Devenney*, 103 Pa.Super. 83, 156 A. 809 (1931) (a defendant acted 'wantonly,' within the meaning of the Act of March 29, 1869, if 'the acts complained of were cruel and were done recklessly and without regard to consequences').

*Simpson*, 832 A.2d at 500-501, n.4.

The present case is not analogous to *Simpson*. As the trial court recognized, this case is similar to *Commonwealth v. Tomey, supra*. In *Tomey*, we affirmed the appellant's convictions of animal cruelty, where the appellant had denied his dogs access to clean and sanitary shelter, the dogs had no access to food or water, and the house the dogs inhabited was unsanitary. Even though the dogs in *Tomey* "were generally in good health" when they were taken into custody, the evidence showed that the conditions of appellant's home were unsafe and unsanitary, and thus posed a threat to the dogs. *Id*. at 292. A dog groomer testified that all of the dogs were stained with urine and had a strong odor of feces on their hindquarters; the dogs all required bathing, nail clipping and ear cleaning, and one required treatment for sores all over his neck. *Id*. at 292-293. We held that "the culpability required of an offender under the cruelty to animals statute is not wanton **and** cruel, but wanton **or** cruel." *Id*. at 294 (emphasis in original).

We further stated:

> This Court has not yet defined 'wanton' in the context of the animal cruelty statute. *But see Simpson, supra* at 500 n. 4 (noting that BLACK'S LAW DICTIONARY defines 'wanton' as '[u]nreasonably or maliciously risking harm while being utterly indifferent to the consequences"). We agree with the *Simpson* Court that the definitions of 'wanton or cruel' within the context of § 5511(c) should be construed according to their 'common and approved usage.' *Simpson, supra*, (quoting 1 Pa.C.S.A. § 1903(a)).

***Tomey***, 884 A.2d at 295.  In affirming the appellant's convictions for animal cruelty, we concluded that "there was sufficient evidence for the trier of fact to find, beyond a reasonable doubt, that [a]ppellant had wantonly denied his dogs access to clean and sanitary shelter.  That the home in which the dogs were kept was unsanitary was never seriously questioned." ***Id***.

In the similar factual circumstances of the present case, the trial court as the fact-finder quoted ***Tomey*** in recognizing that "'Wanton' is defined as '[u]nreasonably or maliciously risking harm while being utterly indifferent to the consequences.'"  Trial Court Opinion, 11/6/14, at 10, *citing* ***Commonwealth v. Tomey***, 884 A.2d 291, 294 (Pa. Super. 2005).  The trial court determined:

> As in ***Tomey***, here [Appellant] wantonly neglected her dogs and cat by denying them access to clean and sanitary shelter, as well as access to veterinary care.  Each animal was filthy with feces, had worms, and some had eye infections, teeth that needed to be removed, and lumps.  It is obvious from the pictures as well as the testimony of the Commonwealth's witnesses that the unsanitary conditions existed for a period of some time. [Appellant] was clearly in denial, and exhibited a conscious indifference to the consequences of the home and animal conditions to [Officer] Frederick and the SPCA workers.

- 10 -

\*\*\*

> The large number of animals in the home required far more care than [Appellant] and her helpers provided. It is not as if [Appellant] had one dog; she should have known, and in fact did know, but did not accept, that she could no longer keep her animals because she could not adequately care for them. Her defense that she became overwhelmed should have led her to call the SPCA herself for help. She did not. Instead, the evidence clearly shows that she kept the animals in her home in filthy, uninhabitable conditions for a sustained period of time. Those animals were relying on her as owner of the home and in control of the home to provide for them, and she had a duty to do so. The condition of the home and animals is evidence of clear neglect by [Appellant].

Trial Court Opinion, 11/6/14, at 10-11.

Consonant with the Black's Law Dictionary definition cited in **Simpson and Tomey, supra**, the trial court aptly defined wantonness as unreasonably or maliciously risking harm while being utterly indifferent to the consequences. **See** Trial Court Opinion, 11/6/14, at 10. We do so as well. More recently, in **Commonwealth v. Crawford**, 24 A.3d 396 (Pa. Super. 2011), we cited **Tomey** and stated:

> The culpability requirement of Section 5511 is wantonness or cruelty. *Commonwealth v. Tomey*, 884 A.2d 291, 294 (Pa.Super.2005), *appeal denied,* 588 Pa. 781, 906 A.2d 542 (2006). The words 'wanton' and 'cruel' are to be construed according to their common and approved usage. *Id*. at 295. In *Tomey*, this court approved of the following definition of "wanton":
>
>> Wanton misconduct means that the actor has intentionally done an act of an unreasonable character, in disregard to a risk known to him or so obvious that he must be taken to have been aware of it and so great as to make it highly probable that harm would follow. It usually is accompanied by a conscious indifference to the consequences.

> *Id*. 'Cruel,' in its common usage, is defined as 'disposed to inflict pain or suffering,' 'devoid of humane feelings,' 'causing or conducive to injury, grief, or pain,' and 'unrelieved by leniency.' *Merriam–Webster's Online Dictionary*.

***Id***. at 402.

Given ***Simpson, Tomey*** and ***Crawford***, ***supra***, we expressly adopt the Black's Law Dictionary definition of "wanton" in the context of the animal cruelty statute, 18 Pa.C.S.A. § 5511, as "unreasonably or maliciously risking harm while being utterly indifferent to the consequences."

The Commonwealth stated in its closing, "[Appellant] didn't have to intend to abuse the dogs. What she had to do was wantonly or cruelly neglect them, and that's exactly what she did." N.T., 8/19/14, at 62. The trial court as fact-finder was persuaded by the Commonwealth's evidence, which was sufficient to support her convictions. The trial court did not err or abuse its discretion in concluding that Appellant acted wantonly, *i.e.*, unreasonably risking harm to her seventeen (17) dogs and one (1) cat while being utterly indifferent to the consequences. We therefore affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/21/2015

- 12 -