J-S35033-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JERRY L. HARDY | : | |
| | : | |
| Appellant | : | No. 475 MDA 2021 |

Appeal from the Judgment of Sentence Entered March 3, 2021
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s):  CP-36-CR-0003627-2019

BEFORE:  OLSON, J., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:        **FILED: DECEMBER 10, 2021**

Jerry L. Hardy (Hardy) appeals from the judgment of sentence imposed by the Court of Common Pleas of Lancaster County (trial court) after a jury convicted him of stalking and harassment.[1]  On appeal, Hardy challenges the sufficiency of the evidence for his stalking conviction.  We affirm.

**I.**

This case arises from Hardy's long-running hostility toward his next-door neighbors, Georgia and Justin Neefe (Neefes).  The Neefes purchased their property in 2011.  According to Georgia Neefe, when they first moved

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2709.1(a)(1) and 2709(a)(7).

in, their relationship with Hardy was cordial. Sometime in 2014, however, their relationship deteriorated when Hardy put up a barbed wire fence on his front porch. Because her children often went there, Georgia Neefe asked Hardy why he put up the fence. He told her he was upset the Neefes put up a lattice fence on their back porch because it felt like they were spying on him.

Things got worse when Hardy began firing guns on his property. He would do this during the day and night. In fact, he would fire his guns if he saw that the Neefes were outside, stopping his yardwork to shoot off hundreds of rounds. He would fire his guns even when the Neefes' children were only 50 feet away, forcing the Neefes to stop their children from playing outside unless an adult was with them. Hardy told Georgia Neefe he would not shoot her but could not promise that he would not shoot Justin Neefe. As a result, she ultimately stopped gardening in her yard.

Because of Hardy's conduct, the Neefes put up a fence and security cameras. That prompted Hardy to put up his own cameras pointed toward the Neefes' home. Hardy also burped profanities over the fence when the Neefes were outside; Georgia Neefe estimated he did this about 50 times through the years. Justin Neefe would also check their security cameras footage and see Hardy mouthing profanity at the cameras. Finally, Hardy placed severed deer heads on long poles above the Neefes' fence. He put the first one up in 2017 and let it rot for months until it fell off, at which time he

replaced it with a new one. At trial, the Neefes testified that they felt helpless because they could not remove the deer heads from Hardy's property.

The police eventually charged Hardy with misdemeanor disorderly conduct along with several summary citations. Hardy's behavior, however, continued, as he spray-painted "lying perverts" on his shed and would wait for Justin Neefe to drive to work so he could pull out in front of him and drive five miles per hour. Ultimately, in June 2019, Hardy entered into a global plea agreement on his cases. He pleaded guilty to one count of disorderly conduct graded as a third-degree misdemeanor and was sentenced to one year of probation. The trial court accepted the plea and ordered that he have no contact with the Neefes.

Within a day, however, Hardy resumed his behavior, first by "flicking off" the Neefes' security cameras and then by belching profanities when the Neefes were outside. The Neefes called the police and Hardy received new charges of stalking and harassment. He eventually proceeded to a jury trial that ended with him being found guilty of both offenses. This time, the trial court sentenced him to an aggregate 3 to 23 months' imprisonment, followed by three years of probation. After denial of his post-sentence motion, Hardy filed this appeal to challenge the sufficiency of evidence for his stalking conviction.[2]

_____

[2] Our standard of review of this matter is well-settled:

**II.**

Hardy was convicted under 18 Pa.C.S. § 2709.1(a)(1), which states that a person commits the crime of stalking when a person:

(1) Engages in a course of conduct or repeatedly commits acts toward another person, including following the person without proper authority, under circumstances which demonstrate either an intent to place such other person in reasonable fear of bodily injury or to cause substantial emotional distress to such other person ....

18 Pa.C.S. § 2709.1(a)(1).

The Commonwealth alleged in its information that Hardy intended to cause substantial emotional distress. Section 2709.1 defines "emotional distress" as "[a] temporary or permanent state of mental anguish." 18 Pa.C.S. § 2709.1(f).

---

As a general matter, our standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about Hardy's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

**Commonwealth v. Sebolka**, 205 A.3d 329, 336–37 (Pa. Super. 2019) (citation omitted).

Hardy claims that his behavior after the plea—rude as it may have been—was not egregious enough to show an intent to cause substantial emotional distress. He first minimizes any gestures he made to the security cameras, arguing that the fact that he "did these things while the Neefes were not around … tends to show that [he] was not intending to cause a substantial level of emotion distress." He also downplays his belching of profanities when the Neefes were outside, characterizing it as *de minimis* behavior. He further contends that his conduct did not, in fact, cause substantial emotional behavior, as Georgia Neefe described merely feeling "frustrated, stressful, helpless, disheartened, and nervous." Justin Neefe, meanwhile, testified that he was not afraid or intimidated by Hardy; instead, Hardy's conduct only made him "anxious."

In other words, Hardy essentially asserts that the Commonwealth failed to prove that he had the requisite *mens rea* to commit stalking; that is, he did not subjectively intend to cause substantial emotional distress to the Neefes. However, as we have explained:

> The Commonwealth is not required to depend upon proof [of subjective intent] by direct evidence, but may also meet its burden by circumstantial evidence alone.
>
> > A state of mind by its very nature is subjective; a person's mind cannot be opened so that his or her intent can be observed. In the absence of a declaration disclosing a person's intent, therefore, one can only look to the content and the circumstances surrounding it to determine the mental state which occasioned it.

***Commonwealth v. Crawford***, 24 A.3d 396, 405 (Pa. Super. 2011) (citation omitted).

As a result, the jury was not required to view Hardy's behavior after the plea and sentencing in a vacuum. Rather, the jury viewed his June 2019 conduct in context because the Commonwealth admitted evidence about his behavior through the years to explain his history with the Neefes.[3] Even if these acts may not seem intended to cause substantial emotional distress by themselves, the jury considered them in the context of Hardy committing them just after he had been ordered by the trial court to not do anything further.

That these acts caused substantial emotional distress was also confirmed by Georgia Neefe. Concerning the plea deal, Georgia Neefe testified that she and her husband expected it to bring "peace" and that they would be "left alone." N.T., 3/2/21, at 79. She described her mental state at the time:

> It was very, very hard. And I was pregnant and it was a very hard pregnancy. And the stress of every time you walk out your door morning, noon and night, like just the recurrence of it … it's an overwhelming stress and a change of our habits and hobbies. And it's changing everything to try to keep the peace. And I needed peace.

***Id***.

_____

[3] Before trial, the Commonwealth filed notice of its intent to introduce evidence of other crimes, wrongs or acts under Pennsylvania Rule of Evidence 404(b). ***See*** Commonwealth's Notice, 12/21/20. On appeal, Hardy does not challenge the trial court allowing the Commonwealth to admit evidence about his conduct before the June 2019 plea and sentencing.

Justin Neefe similarly testified they were hopeful that the plea would end the tensions between them and Hardy.

> We felt hopeful and relieved. We were about 20 days out from having our sixth child, and we were mentally and physically exhausted from dealing with this and, we thought that this was going to be the end, like we were going to be putting it behind us.

*Id*. at 107.

As noted, however, Hardy continued his actions immediately after the plea. Georgia Neefe testified about how this conduct made her feel, stating it made her "[d]isheartened and frustrated," as if "the whole plea thing might have been pointless because that was supposed to – that was supposed to end it." *Id*. at 83.

This was consistent with her prior testimony about the cumulative effect that Hardy's behavior had on them through the years. For instance, she testified about how she felt after Hardy spray-painted "lying perverts" on his shed:

> You just feel so helpless in a situation like this. And every additional thing that's done, you feel more and more helpless because you can't do anything. You can't do anything, like, back or to retaliate, or then you're no better. So you just have to say, it's another thing we have to live with.…

*Id*. at 75.

Justin Neefe, meanwhile, described being "miserable" because of Hardy's conduct. When asked how it affected his life, he answered as follows:

> …After work I did not want to come home. I didn't enjoy being home. I was constantly anxious, like when your chest gets tight, because I was stuck. I couldn't – I didn't want to take matters

into my own hands because I know that I – it wouldn't be a good thing. And we're trying to raise our five kids. And it's just nonstop, relentless. It was nonstop. It was relentless. And after a certain amount of time when you're not getting a lot of sleep and all you're doing is working and when you're home, you're stressed, you lose patience with your kids, which isn't fair to them….

*Id*. at 120.

Viewing this evidence in the light most favorable to the Commonwealth as the verdict winner, the Commonwealth presented sufficient evidence to establish that Hardy intended his course of conduct to cause substantial emotional distress. First, we find his attempts to minimize his behavior unpersuasive. Whether in person or toward the security cameras, there was sufficient evidence for the jury to conclude that Hardy directed his behavior toward the Neefes with an intent to cause substantial emotional distress. Again, while "flicking off" a security camera or belching profanity may not seem overly offensive, Hardy committed the acts directly after receiving probation for his behavior through the years. As Georgia Hardy testified, Hardy's post-plea behavior caused her to feel "disheartened and frustrated" because she felt that his plea had been "pointless" if he was going to persist in his course of conduct. In our view, this was enough for the jury to conclude that Hardy intended to cause substantial mental anguish against Georgia Neefe, who was pregnant at the time, and her family.

Moreover, contrary to Hardy's belief that the Neefes did not describe their mental anguish in strong enough terms, there was sufficient evidence

that his behavior, in fact, caused substantial emotional distress. There are no "magic words" a stalking victim must speak to establish that he or she suffered substantial emotional distress, and Hardy cites no case law for any such proposition.

In any event, Hardy's seeming belief that the Neefes suffered only mild annoyance from his actions is not reflected in their testimony. Georgia Neefe described feeling "disheartened" and "helpless." Justin Neefe, meanwhile, described being "miserable" and dreading having to go home from work, as Hardy's "relentless" conduct caused him to feel "constantly anxious." These descriptions were more than enough for the jury, which had the opportunity to hear and observe the Neefes' testimony, to conclude that Hardy's conduct after the plea was intended to cause substantial emotional distress. We, thus, find that there was sufficient evidence to convict him of stalking.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/10/2021

- 9 -