J-A19018-22

2022 PA Super 159

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
ANDREW JOSEPH HUMMEL, IV :
:
Appellant : No. 1271 MDA 2021

Appeal from the Judgment of Sentence Entered September 10, 2021
In the Court of Common Pleas of Tioga County Criminal Division at
No(s):  CP-59-CR-0000102-2020

BEFORE:   BOWES, J., KING, J., and STEVENS, P.J.E.*

OPINION BY STEVENS, P.J.E.:            **FILED: SEPTEMBER 16, 2022**

Appellant, Andrew Hummel, appeals from the judgment of sentence entered in the Court of Common Pleas of Tioga County, which, sitting as finder of fact, convicted him of both Aggravated Cruelty to Animal—Torture,[1] for causing the death of his horse by prolonged deprivation of food or sustenance without veterinary care, and related, lesser offenses.  Sentenced to three to 24 months' incarceration, Appellant challenges the sufficiency of the evidence offered to prove, *inter alia*, he tortured the horse as defined under the Aggravated Cruelty to Animal statute.  We affirm.

The trial court provides an apt recitation of facts and procedural history, and we adopt it herein.  Our independent review of the notes of testimony

_____

* Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. § 5534(a)(1).

from Appellant's criminal trial reveals the following pertinent facts regarding his role in causing the decline and eventual death of Appellant's horse.

Appellant works in the repossession industry. He is not a farmer. He and his family moved to Tioga County after spending summer weekends there one year, and his children soon wished to have animals on their small "farmette." Horses, steer, rabbits, pigs, and chickens were purchased, and they became pets or "Future Farmers of America projects." N.T. 1/27/21 at 135-158. As noted, this case involves the physical decline and death of the one remaining horse Appellant owned.

Penny Moore testified that she would see the horse in question during her daily visits to her parents' farm, which sits across the road from Appellant's property. N.T. at 7. Moore was born and raised there, and she testified that she enjoyed a neighborly friendship with the Hummels when they first moved to their farmette, so much so that she assisted them in locating a different horse from the animal rescue adoption program several years earlier.

Their friendship eroded, however, when Appellant made no effort to prevent his horse and steer from grazing and eating the hay bales on her parents' farm, *i.e.*, "free-ranging", and also taking shelter in their barn during winters. N.T. at 9.[2] According to Moore, the last time she saw the horse and

_____

[2] On cross-examination, Moore explained that she had called the state police several times to complain about the roaming of Appellant's animals. She confirmed that Appellant was thus summoned to court several times and
*(Footnote Continued Next Page)*

steer look healthy was when they were able to free-range for food. N.T. at 13-14.

Moore testified that she has extensive experience in assessing the health of horses from not only working her family farm but also attending post-secondary business school for equine marketing and subsequently working at a horse racetrack in Buffalo, New York. N.T. at 6. She explained that she has been around farm animals, including horses, all her life. *Id*.

Moore's initial concerns were for the steer. In September 2019, after her free-ranging complaints prompted a court order requiring Appellant to fence in his animals, she noticed the steer had become "very skinny. I mean its rump was showing; it was really in rough shape." N.T. at 10. When she had not seen the steer for several months thereafter, she assumed it had been butchered or died. N.T. at 10-11.

As for the horse, Moore first called Tioga County Animal Humane Officer Krys Knecht on November 20, 2019, with concerns about the horse being tied to a tree and looking poorly. Shortly thereafter, she saw the horse alongside the road dragging a 2x4 piece of lumber and looking "very skinny—not in good condition." N.T. at 5, 8.

_____

ordered to keep the animals on his own property. She also acknowledged that her relationship with Appellant's family deteriorated after her filing of complaints, and she claimed Appellant and his children engaged in retaliatory, intimidating behaviors with their vehicles, such as tailgating and "doing donuts" in front of her parents' home. N.T. at 21.

- 3 -

Approximately three weeks later, on December 10, 2019, Moore called Knecht again to report that she did not know where the steer was but that the horse was now tied to a horse trailer in the front of Appellant's property and looked "very bad." N.T. at 11. Specifically, she related at trial:

the horse's hip bones and everything is sticking out; the ribs are –the backbone you can see is this far [indicating]. I said, there's no water there, and there's an old ratty hay bale that I wouldn't feed a cow, let alone a horse. . . . I said, 'it's in very rough shape. . . . [T]here's no food there that's satisfactory for a horse to eat and, I said, there's no water.

. . .

[A]t first, [the horse] was standing up. And then the day I called [Officer Knecht] I said, Krys, this horse is laying down. I said, it's not looking good. And the next day [December 12, 2019] I went by and the horse was laying there – and I said, Krys, the horse is dead."

N.T. at 11-12. Moore testified that in her experience, seeing the backbone protrude to such a degree means a horse is neglected, undernourished, and maybe dehydrated as well. N.T. at 11.

Moore reiterated that she would visit her elderly parents' farm every morning and evening to feed their animals, and she never witnessed the Hummels feeding theirs. When she called her parents' cows, the Hummels' animals also would come. She described how once the Hummels were ordered to place fencing around their property, their animals eventually ate all the grass and would be standing on bare dirt. At that point, Moore testified, "there was nothing for them to eat, and you could see the deterioration going in the animal." N.T. at 13.

- 4 -

Officer Knecht testified that she visited Appellant's property on the evening of November 20, 2019, to speak with Appellant about the horse, but Appellant refused to talk to her and told her to leave. N.T. at 24. As Knecht was leaving, she attempted to shine a light on the horse where it was tethered to a tree, but Appellant used his truck to tailgate Knecht and force her quick departure. N.T. at 24.

Over the next few weeks, the horse was out of view, and Officer Knecht assumed it was being kept in the barn. N.T. at 25. On December 11, 2019, however, Knecht acted on Moore's follow-up phone call expressing concern over the horse being tethered outdoors in freezing conditions, looking ill, and lying down. N.T. at 25-26. Knecht went to the property, saw the horse lying motionless on the ground, and applied for a warrant. N.T. at 26.

Accompanied by the Pennsylvania State Police and volunteers, Knecht executed the first warrant at Appellant's property on December 12, 2019. She found the horse was deceased, bloated with internal fermentation, and frozen to the ground with a pile of feces immediately behind its rectum. N.T. at 26.[3] Knecht testified the horse was still tethered to the gooseneck hitch with an approximately five foot long rope that was too short to allow the horse to

_____

[3] During execution of the warrant, PSP contacted an off-site Appellant by cell phone and apprised him of the ongoing execution of the warrant.

reach the inside of the trailer for shelter. N.T. at 27, 28. An old bale of hay sat near the body, and there was no water. N.T. at 28.

> She described the scene as follows:
>
> The horse appeared to be concerningly emaciated. It was frozen into the ground. It had a laceration around the front leg that appeared to be from where the rope that had it tethered got wrapped around or – and there were red marks through up its chest from, you know, the rope getting wrapped around. We had to cut the rope to remove the horse.

N.T. at 29. Knecht confirmed the horse sustained injuries from the rope, including "a pretty deep laceration" to the front leg. N.T. at 29, 32. Given the late time of day, the PSP directed the volunteers to remove the horse's body, and Officer Knecht applied for a second warrant for the similarly emaciated steer on the following day.[4] On December 14, 2019, she executed the warrant for the steer and confiscated it for emergency care.

_____

[4] Officer Knecht's December 12, 2019, search included checking other areas of the property, including both the stable in which the steer was kept and two rabbit hutches. Knecht testified that the steer had no access to hay, grain, or water and seemed pretty stressed. N.T. at 27, 39.

Knecht applied for a second warrant on the 13th. On the same day, Appellant placed an "agitated" phone call to veterinarian Kathryn Baker, who accommodated his request that she assess the steer that day. **See** infra.

When Officer Knecht executed the second warrant on the 14th, she observed changed conditions in the steer's stable. The trough now contained grain, and hay had been scattered around. There was still no water, however, only chunks of ice at the bottom of the container. N.T. at 37, 42.

(Footnote Continued Next Page)

Dr. Jason Brooks, a veterinarian with a Ph.D. in research and pathology and 18 years' experience performing roughly 200 necropsies annually, performed the necropsy on the horse. Dr. Brooks used the "Henneke Body Condition Scale" to assess how much of the horse's skeleton was visible under the skin. On a scale of 1 to 9, with 1 indicating the thinnest and 9 indicating the heaviest, Dr. Brooks assigned this horse a 2, which he explained was, "using the terminology on the scale, 'very thin.'" N.T. at 85.

Dr. Brooks elaborated:

"Very thin indicates that . . . there's a very slight to minimal amount of fat over the base of the spine, perhaps over the ribs and the tailhead. But the bones over the hips, the pelvis, around the hind end of the animal are very visible, as well as the bones over the shoulder and the -- both the side of the shoulder and the top of the shoulder, which is called the withers, as well as the neck. So those bones are discernable.

. . .

So I've assigned a score of 2 to this animal. And then, furthermore, so when I began to reflect the skin, as I had just described, the – I'm just looking at my report here, so that I recall correctly – but, yeah, there was very little visible adipose tissue, which is fat tissue in the tissues underneath the skin.

So if we would have looked very closely along the spine, there probably was still a small amount over the spine. But over the majority of the body there was no visible fat tissue.

And there was a decreased volume of skeletal muscle compared to what would be normally expected. So, in other words, there was some wasting, or atrophy is the term we use, which just means wasting of the skeletal muscle over – in horses it's usually

---

Knecht and her volunteers walked the "dehydrated" and "very docile" steer to their vehicle and transported it to the Tioga County Human Society Shelter, where it started "drinking profusely" from a 5-gallon bucket of heated water. N.T. at 44.

over the big muscles, over the shoulders and over the rump, the hind leg, the upper part of the hind leg.

N.T. at 85, 86.

When asked how long it would take for the deprivation of food or sustenance to cause a horse such as this to reach this degree of wasting, Dr. Brooks responded it would take many weeks or several months:

[T]he wasting of skeletal muscle and the metabolism of fat to store a normal amount down to almost none certainly takes a long amount of time, and this is not something that happens in a matter of days.

You know, this is something that requires many weeks or several months to occur.

N.T. at 86-87.

A Bone Marrow Fat Analysis is another way to evaluate the nutritional status of an animal, Dr. Brooks explained. Normal bone marrow has the consistency of peanut butter and a whitish to yellowish coloration, which indicates a normal amount of fat. N.T. at 93. As an animal becomes emaciated and its body fat is being consumed, the amount of fat in the marrow also decreases. As a result, the marrow loses its peanut buttery consistency and becomes gelatinous. Also, the color changes from whitish/yellowish and progresses toward a more reddish color. N.T. at 94.

The bone marrow of this horse was thin and gelatinous and orange in color. "So that tells me, right away, that there was a greatly decreased amount of fat in the bone marrow," Dr. Brooks explained. N.T. at 94. The doctor confirmed this with a chemical analysis to determine what percentage

of bone marrow was composed of fat. Normally, that number is 80%, but in this horse, the number was 24.4%, which the doctor indicated was significantly less than normal. N.T. at 95.

Based on these findings, Dr. Brooks made the diagnosis of "emaciation." The body score of 2 out of 9, the visual examination of a body revealing muscle wasting and no visible fat under the skin, and the Bone Marrow Fat Chemical Analysis together confirmed this diagnosis. N.T at 94-95. The cause of death, therefore, was emaciation. N.T. at 95.

Dr. Brooks discussed what possibly contributed to the horse's emaciation. From mouth to anus, the horse exhibited no injury, deficit, disease, parasitic or microbial condition, or any other medical abnormality that would have interfered with its ability to eat and digest food and absorb nutrients, Dr. Brooks explained. N.T. at 91-92, 95-96. It was Dr. Brooks' opinion, therefore, that emaciation resulted from either insufficient volume of feed or insufficient quality of feed. N.T. at 98.

At the conclusion of trial, the trial court found Appellant guilty on all charges, including the charge of Aggravated Cruelty to Animal—Torture at 18 Pa.C.S. § 5534(a)(1). Appellant filed a post-sentence motion seeking acquittal on all convictions.

Appellant first argued that the Commonwealth had failed to prove he owed a "duty of care" to the animals where there was no evidence that he

owned the animals in question and the defense witnesses consistently testified that the children were responsible for caring for the animals.

Nor did evidence satisfy the Commonwealth's burden to establish a lack of "basic needs," namely, shelter, sustenance, water, and necessary veterinary care for the animals, the post-trial motion continued. On this point, the motion alleged that Officer Knecht testified "the animals" had proper shelter and the evidence otherwise failed to establish what necessary veterinary care was denied the horse. In fact, Officer Knecht testified that only the steer had shelter.

Appellant also posited that defense evidence showed the animals received food, water, shelter, and veterinary care. There was no evidence that the animals were denied such care, he maintained, and the Commonwealth relied largely on the fact that a few witnesses saw the animals without food or water to drink on a few particular occasions. "The law does not mandate that animals have continuous access to food and water[,]" he emphasized. Appellant's Post-Trial Motion at 15.

With specific reference to his convictions at Section 5534(a)(1), Aggravated Cruelty to Animal, Appellant's motion first asserted that evidence proved neither the proscribed act under the statute, namely, prolonged deprivation of food or sustenance without veterinary care causing severe and prolonged pain, nor that he knowingly or intentionally engaged in such an act.

No such deprivation of food, sustenance, or veterinary care occurred, the motion maintained.

In this vein, the motion claimed Appellant "contacted a veterinarian, Dr. Kathryn Baker, to assess the horse. She recommended only that the animals receive sufficient food and water[, and the] record shows that, after her visit, they did have sufficient food and water. Accordingly, any 'deprivation' was not 'without veterinary care.'" Appellant's Post-Trial Motion at 16.

However, Appellant's motion misstated the record on this point, as Dr. Baker assessed only the *steer* when she visited Appellant's farm, because the horse was already dead.

Specifically, during trial, Dr. Baker testified that an agitated Appellant called her on December 12, 2019, claiming there had been reports against him about a thin *steer*. She went to Appellant's farm at midday on the same date to assess the *steer*. N.T. at 61-62, 72. Therefore, it is clear that Dr. Baker's visit occurred only after Officer Knecht had executed a warrant at Appellant's farm earlier that same day, discovered the horse was dead, and observed the steer in distress.[5]

---

[5] Officer Knecht testified that the steer was emaciated and without any water, hay, grain or any sustenance whatsoever. N.T. at 34. She would have removed the steer that day but police were unavailable to assist her.

Nevertheless, Dr. Baker's assessment of the steer and the conditions to which it was subjected was relevant to the charge of torture relating to the horse, but not in a way that was favorable to Appellant's position. Her report on the emaciated steer[6] differed from Officer Knecht's only with respect to her observation that the stable in which the steer was housed now contained hay, but it was "so black and moldy it was hard." N.T. at 63. She opined the steer would not have been able to consume it or even chew it, and that there was no nutritional value to the hay in any event. *Id*. This observation and opinion tracked the earlier testimony of Penny Moore that she found next to the horse's body an "old ratty hay bale" that was unfit for a cow, let alone a horse. N.T. at 11.

Moreover, Dr. Baker noted the steer had before it what appeared to be a newly-poured mound of fresh grain, which had not been touched, and a bucket of frozen-over water that the steer could not have drunk. The significance of water, Dr. Baker continued, was that livestock would be unable to swallow grain without it. N.T. at 64.

_____

[6] Dr. Baker assessed the steer according to the Body Condition Score Scale, which is a numerical scale relating to how much fat and muscle is on an animal. N.T. at 60. After explaining that a score of 1 or 2 would apply to an emaciated animal, she testified that she assigned to the "very thin" steer the lowest score she would give to any animal, a 1½, consistent with her education and training to never assign a 1 since a more emaciated animal is always possible. N.T. at 62. She specified the "very bad" muscle wasting the steer exhibited, and opined it would have taken approximately one month of having no food for the steer to have declined to the physical condition she observed on that day. N.T. at 65.

Contrary to Appellant's assertion in the post-trial motion, therefore, no veterinary care for the horse occurred during the relevant timeframe. The necropsy of the horse represented the first time a veterinarian was involved with it during the relevant time period, and his medical opinion was that it had endured prolonged deprivation of food or nourishment.

After the denial of Appellant's post-trial motion, this timely appeal followed. Appellant asks this Court to review, *inter alia*, whether evidence was sufficient to prove that the horse endured torture as that term is used in 18 Pa.C.S. 5534(a)(1) and defined in 18 Pa.C.S. 5531.[7]

"A claim challenging the sufficiency of the evidence is a question of law." ***Commonwealth v. Widmer***, 560 Pa. 308, 744 A.2d 745, 751 (2000).

> In determining whether the evidence was sufficient to support a defendant's conviction, we must review the evidence admitted during the trial along with any reasonable inferences that may be drawn from that evidence in the light most favorable to the Commonwealth as the verdict winner. If we find, based on that

---

[7] Assuming, *arguendo*, that Appellant has preserved his remaining issues with sufficiently developed argumentation to warrant appellate review, we conclude our determination that sufficient evidence supported Appellant's conviction for Aggravated Cruelty to Animal—Torture under Section 5534(a)(1) is dispositive of the remaining issues Appellant raises in his brief. Evidence of Appellant's knowing deprivation of food or sustenance for a prolonged time without affording veterinary care or supervision satisfies Section 5333's elements of knowing or reckless ill-treatment or abandonment and Section 5532's elements of knowing or reckless failure to provide basic needs. **See** 18 Pa.C.S. § 302(e), **"**Substitutes for negligence, recklessness and knowledge**,"** which states, in pertinent part, "When the law provides that negligence suffices to establish an element of an offense, such element also is established if a person acts intentionally or knowingly."

review, that the jury could have found every element of the crime beyond a reasonable doubt, we must sustain the defendant's conviction.

*Commonwealth v. Crawford*, 24 A.3d 396, 404 (Pa. 2011) *(quoting Commonwealth v. Janda*, 14 A.3d 147 (Pa.Super.2011) (internal citation omitted)). "Further, a conviction may be sustained wholly on circumstantial evidence, and the trier of fact—while passing on the credibility of the witnesses and the weight of the evidence—is free to believe all, part, or none of the evidence." *Commonwealth v. Miller*, 172 A.3d 632, 640 (Pa. Super. 2017) *Id*. "In conducting this review, the appellate court may not weigh the evidence and substitute its judgment for the fact-finder." *Id*.

Section 5534(a)(1), Aggravated Cruelty to Animal, provides:

**(a) Offense defined.--**A person commits an offense if the person intentionally or knowingly does any of the following:

(1) Tortures an animal.

. . . .

**(b) Grading.--**A violation of this section is a felony of the third degree.

18 Pa.C.S. § 5534(a)(1), (b).

"Torture" is defined in 18 Pa.C.S. 5531, Definitions, in relevant part:

"**Torture**." Any of the following acts directed toward or against an animal unless directed to be performed by a licensed doctor of veterinary medicine acting within the normal scope of practice:

. . .

(3) Causing or allowing severe and prolonged pain through prolonged deprivation of food or sustenance without veterinary care.

18 Pa.C.S. § 5531.

Finally, the general requirements of culpability as set forth in 18 Pa.C.S. 302, provide, in relevant part:

(2) A person acts knowingly with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and

(ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

18 Pa.C.S. § 302.

"The inclusion of the words knowingly or intentionally in a statute indicates a legislative intent to require the inclusion of those *mens rea* requirements as 'necessary ingredients of such offenses.'" ***Commonwealth v. Scolieri***, 813 A.2d 672, 677 (Pa. 2002). "Requisite knowledge and intent may be inferred from examination of the totality of the circumstances." ***Commonwealth v. Maloney***, 876 A.2d 1002, 1007 (Pa. Super. 2005) (*quoting* ***Commonwealth v. Ortiz***, 786 A.2d 261, 270 (Pa.Super.2001) (collecting cases)).

Challenging the sufficiency of the evidence in his case, Appellant focuses on the culpable acts and states of mind as addressed in the statutory provisions above, and he posits that the Commonwealth offered insufficient evidence in support of each element. The crux of Appellant's argument is that because Dr. Brooks could not rule out malnourishment, as opposed to overt deprivation of food, as the cause of the horse's death, the Commonwealth had

failed to prove beyond a reasonable doubt that Appellant knowingly fed the horse an insufficiently nourishing diet. Necropsy findings of hay in the horse's digestive tract coupled with evidence of hay at the site where the horse died showed a good faith effort to feed the horse, Appellant maintains, and the Commonwealth was unable to introduce any evidence demonstrating his knowledge that insufficient sustenance or nourishment was being delivered.

In this vein, Appellant first denies that evidence established the prolonged deprivation of food or sustenance, and he insists the trial court, in its role as finder of fact, was bound to accept, instead, the "undisputed" testimonies offered by his children and him that they fed the horse regularly and, to the best of their knowledge, properly. We disagree.

Section 5534(a)(1) makes culpable the prolonged deprivation of "food or sustenance" when either causes severe and prolonged pain. The term "sustenance" as used in section 5534(a)(1) is not defined specifically and should, therefore, be construed according to its "common and approved usage." 1 Pa.C.S. § 1902(a). Merriam-Webster's Dictionary defines "Sustenance" as a "means of support, maintenance, or subsistence. Food, provisions. Also, nourishment." *Sustenance*, MERRIAM-WEBSTER ONLINE DICTIONARY (last visited August 26, 2022).

Consistent with the basic tenets of statutory construction requiring courts to give effect to all of a statute's provisions, **see** 1 Pa.C.S. § 1921(a); **Commonwealth v. Ostrosky**, 909 A.2d 1224, 1232 (Pa. 2006), we read

subsection 5534(a)(1) to contemplate both the withholding of food itself and the withholding of nourishment necessary to sustain or support well-being and life. It follows, then, that simply feeding an animal *something* will not insulate one from culpability under Section 5534(a)(1) if the animal suffers prolonged and severe pain caused by prolonged deprivation of a sustaining level of nourishment.

Therefore, if the evidence permits the reasonable inference that an owner was aware the animal's feed was proving incapable of supporting its well-being in this manner—because, for example, the feed itself was clearly degraded or substandard and/or the otherwise healthy animal was visibly wasting despite receiving a sufficient amount of feed—and allowed this process to continue until substantial harm or death befell the animal, then a finder of fact may reasonably find the Commonwealth has made its case for aggravated cruelty to an animal under Section 5534(a)(1).

Addressing Appellant's contention that evidence failed to prove the prolonged deprivation of food or sustenance, we acknowledge that no eyewitness testified specifically to witnessing first-hand a pattern of skipped or malnourishing feedings.[8] Nevertheless, the Commonwealth's undisputed evidence of a chronically emaciated horse whose official cause of death was

---

[8] As discussed, however, Penny Moore testified that Appellant's animals including the horse, frequently "free-ranged" onto neighboring properties including her parents' farm when she was feeding their animals. This behavior, Moore opined, was an indication that the animals were not being fed adequately by Appellant. N.T. at 13-14.

prolonged deprivation of either sufficient volume of food or sufficient quality of food over the course of many weeks or several months was sufficient to prove the element of prolonged deprivation of food or sustenance.

As noted, Appellant cites the presence of hay in the horse's stomach and small intestine, and feces in the colon, as proof the horse was not deprived food. What he fails to acknowledge, however, is that these very same necropsy findings support the conclusion that the horse was able to digest food properly if given it, which only begs the question of how else but by the lack of food or sustenance could the horse have arrived at such an emaciated state.

Dr. Brooks clarified that the presence of hay in the horse's system indicated only that it had consumed hay over the prior two to three days, whereas its death by emaciation, he emphasized, told the story of deprivation of food or sustenance for many weeks or several months. He reached this conclusion, he explained, because the necropsy revealed the horse had possessed a healthy, unremarkable digestive system from mouth to anus that revealed no disease or malady that would impede proper digestion and absorption of nutrients.

Relatedly, Dr. Baker observed a virtually identical level of emaciation in the steer that frequently accompanied the horse. With respect to the Henneke Body Condition Score, the steer and the horse were assigned virtually identical scores by two different veterinarians: the steer a "1½" by Dr. Baker, and the

horse a "2" by Dr. Brooks. The parallel experiences of the steer and horse in both degree and timing of emaciation further supported the Commonwealth's theory that the horse's condition was the product of Appellant's deprivation of sustenance rather than of the horse's age or internal health.

Finally, both Penny Moore and Officer Knecht testified about not only the obviously emaciated state of the horse over the final month of its life but also the patently unsuitable quality of the hay found alongside the horse's corpse. Significantly, Dr. Baker corroborated this account of the hay Appellant was supplying to his animals when she described the hard, black, inedible hay and lack of water that was available to the steer during her visit the following day on December 13, 2019, when Appellant had called her only after Officer Knecht advised she would return to take the emaciated steer.

Under the sufficiency of evidence standard, the trial court was free to discredit the testimonies of Appellant and his family that they had fed the horse properly and regularly and to credit, instead, the Commonwealth's witnesses' testimonies that the horse's significantly emaciated state, coupled with the presence of unfit feed at its disposal, demonstrated that it had been deprived food or sustenance for a prolonged time. ***See Miller***, ***supra***. Accordingly, we discern no merit to Appellant's argument on this point.

Appellant next contests evidence offered to prove that the horse suffered "severe and prolonged pain." ***See*** Brief of Appellant at 19. It is true that no Commonwealth witness explicitly stated that the horse suffered severe

and prolonged pain. However, ample evidence supported the reasonable inference that such pain accompanied the prolonged deprivation of either food or sustenance that caused the horse to waste away slowly and, eventually, die. *See Crawford*, 24 A.3d at 405 (Pa. Super. 2011) (citation omitted) (recognizing Commonwealth may meet its burden of proof of animal torture with circumstantial evidence alone; "[m]uch of the law against animal cruelty can be summed up in the phrase 'common sense'").

Eyewitnesses Penny Moore and Tioga County Humane Officer Krys Knecht provided well-informed assessments of the horse's patently obvious and progressive wasting during its last month of life. Dr. Brooks confirmed that the cause of death was emaciation caused by deprivation of food or sustenance. In either case, he opined, the course to end-stage emaciation and death did not consist of a few days. Rather, he explained, it took a considerable amount of time, as the horse would have endured such deprivation for many weeks or several months, before death occurred.

By its very terms, the definition of "Torture" in Section 5531 acknowledges the reality that severe and prolonged pain may flow from prolonged deprivation of food or sustenance outside the direction of a veterinarian. The question thus arises in the case *sub judice* as to how chronic deprivation of food or sustenance could cause any more pain to an animal than when it causes death over the course of many weeks or several months in the absence of appropriate medical oversight. If the horse in this case did

not suffer the requisite level of pain through deprivation of food or sustenance under Section 5534(a)(1), then what must an animal endure to meet the statutory standard?

Viewing the extensive relevant evidence in a light most favorable to the Commonwealth as verdict winner, we hold it was sufficient for the finder of fact to settle on the reasonable, if not inescapable, inference that the horse suffered prolonged and severe pain while dying a slow death from emaciation.

Finally, this same record supplied ample *mens rea* evidence that Appellant knowingly allowed the horse to endure pain and deprivation of sustenance without veterinary care. This was his only horse, it lived on his small farmette for years, and it displayed an increasingly grave, emaciated physical state that was immediately apparent when viewed even from a distance. Dr. Brooks discussed the classic external features of emaciation, namely muscle wasting, loss of adipose tissue, and prominent spinal column, ribs, and pelvic bones, and he indicated that the presence of such defining features on this horse were plain to the eye. Recognition of the horse's emaciated state did not require a medical degree or an internal necropsy.

At least one month before the horse died, Appellant had been confronted by Animal Humane Society Officer Knecht, who related neighbor complaints over the absolutely gaunt appearance of the horse. Appellant's response was not one of concern for the horse, but, instead, to run Officer Knecht off his property through intimidating means. Even after receiving the officer's visit,

he made no attempt to recruit veterinary intervention to assist his obviously failing horse.

Just a day or two before the horse died, Penny Moore noticed the horse had been moved from a concealed location within the farmette—which had prevented her from assessing the horse over the prior several weeks—to Appellant's front yard, further supporting the inference that Appellant had been in contact with the horse, must have known known of the horse's critical state, and still made no attempt to secure veterinary care. In contrast, Moore immediately called Officer Knecht to report the horse's grave condition and lack of suitable food and to ask for official intervention.

Similarly, Officer Knecht explained how, during her December 12, 2019, execution of the warrant, she found the deceased horse in Appellant's front yard, lying frozen alongside an old hay bale, still tethered with a rope far too short to permit the horse to take shelter inside a nearby trailer in the front yard. N.T. at 27. She also reported how, on the same day, she observed that the steer had no water, no hay, and was "stressed." *Id*.

The totality of evidence, therefore, sufficed to prove that Appellant was aware his horse was becoming, over the course of several months, significantly emaciated from prolonged deprivation of food or sustenance that naturally would cause it to experience prolonged and severe pain. Yet, he continued to do nothing to aid his horse up to the time of its death, even

despite attempts from a concerned neighbor and an Animal Humane Society officer to intervene on its behalf.

For the foregoing reasons, we conclude that Appellant's challenge to the sufficiency of the evidence is devoid of merit, and we affirm his convictions below.

Judgment of sentence Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/16/2022