J-A11036-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CHAD ROBERT GOLDSTROM | : | |
| | : | |
| Appellant | : | No. 776 WDA 2022 |

Appeal from the Judgment of Sentence Entered March 24, 2022
In the Court of Common Pleas of Armstrong County Criminal Division at
No(s): CP-03-CR-0001034-2020

BEFORE: BENDER, P.J.E., STABILE, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.: **FILED: JUNE 5, 2023**

Chad Robert Goldstrom (Goldstrom) appeals from the judgment of sentence imposed in the Court of Common Pleas of Armstrong County (trial court) following his jury conviction of one count each of carrying a firearm without a license, aggravated assault (causing bodily injury with deadly weapon), and the lesser included offenses of simple assault and recklessly endangering another person (REAP).[1] On appeal, Goldstrom contends that the trial court erred in omitting from its jury instructions a *mens rea* culpability requirement with respect to the non-licensure of his firearm. Applying this

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 6106(a)(1), 2702(a)(4), 2701(a)(1) and 2705. The jury found Goldstrom not guilty of several additional charges brought against him in connection with this incident.

Court's decisions in **Commonwealth v. Scott**, 176 A.3d 283 (Pa. Super. 2017) and **Commonwealth v. Arnold**, 284 A.3d 1262 (Pa. Super. 2022),[2] we vacate the judgment of sentence and remand for a new trial with respect to the firearms and aggravated assault charges. We affirm with regard to his conviction for simple assault and REAP.

**I.**

This case arises from a November 29, 2020 incident where Goldstrom, who is a member of the Pagan Motorcycle Club, shot two members of the rival Outlaws Motorcycle Club, Brian Oss and Justin Shook. The incident was captured by video surveillance cameras. Goldstrom shot Shook in the arm and shot Oss, permanently paralyzing him. Goldstrom claimed he acted in self-defense in shooting the men because they intended to cause him serious bodily injury or death because he left the Outlaws and joined the Pagans. Goldstrom once had a valid license to carry the weapon he used in the shooting, which purportedly, unbeknownst to him, had been revoked.

As a result of this incident, the Commonwealth charged Goldstrom with two counts of Attempted Homicide; two counts of Aggravated Assault with

---

[2] Although **Arnold** was issued while the instant matter was pending on appeal, we apply the legal principles in effect at the time of our decision. **See Commonwealth v. Hummel**, 2023 WL 2764443, at *2 (Pa. Super. filed April 4, 2023) (explaining that appellate courts apply law in effect at time of decision and parties are entitled to benefit of any changes in law occurring before judgment of sentence is final).

intent to cause serious bodily injury; two counts of Aggravated Assault with intent to cause bodily injury with a deadly weapon; one count of Carrying a Firearm Without a License (CFWOL); two counts of Simple Assault; and two counts of Recklessly Endangering Another Person (REAP).

Shook testified at Goldstrom's December 2021 trial that he was standing on the sidewalk outside of a tattoo shop with his friends Oss and Nathan Batistig when "I heard a shot go off. I seen by best friend [Oss] fall on the ground. My first instinct was to run for cover then I got shot." (N.T. Trial, 12/07/21, at 54-55). Shook indicated that neither he nor his friends had weapons in their hands before the shooting. Shook recounted that as he ran across the street to his truck for cover, a bullet struck him in the arm and went completely through his bicep. Shook then checked on Oss, who was lying on the ground screaming for help and sat with him until an ambulance arrived.

Batistig similarly testified that he was not holding a weapon in his hand when he was standing with Shook and Oss outside of the tattoo shop, and he saw no weapons in their hands. Batistig relayed that the incident "happened so fast . . . I was standing there talking with my friends and I heard gunshots and I ran and ducked and that is what I remember." (*Id.* at 88). Batistig then ran over to Oss who was lying on the ground bleeding from his throat. Batistig acknowledged that he was carrying a knife during the incident and explained that he usually wears this knife at his side.

Oss testified that he is a quadriplegic as a result of the shooting and recounted that while he was waiting outside of the tattoo shop, "Chad [Goldstrom] shows up and we have been kind of waiting to go rounds for awhile because he ducked out on me a couple of times. Basically he had been selling meth and I don't like it and I was going to beat him up over it." (*Id.* at 112). They were also at odds because "Goldstrom was a member of our club and he left our club and went out bad . . . you can leave for certain things but he joined the Pagans. That is not one of the things you can leave to go do." (*Id.* at 112-13). Oss recounted that a verbal argument broke out between the men as Goldstrom approached, that he never had a weapon in his hand, and that the knife that he carried remained in a sheath on his hip. Oss testified that he anticipated "we were going to fist fight . . . and do hand-to-hand battle that way." (*Id.* at 116). Instead, Goldstrom pointed a gun "right at my face . . . the bullet went right into my jaw, hit me in the spine and it came out my back." (*Id.*).

On cross-examination, Oss explained that "it became well known that [Goldstrom] had been moving in and the Pagans were taking over and selling meth." (*Id.* at 119). Oss admitted that leading up to this incident, Goldstrom avoided him because he was afraid, and that Oss lurched at Goldstrom outside of the tattoo shop "to beat the hell out of him." (*Id.* at 130).

Goldstrom's wife, Casey Scalzott, testified that she and Goldstrom scheduled appointments at the tattoo shop on Sundays to avoid confrontation

with the Outlaws. As they approached the shop on the day of the incident, Scalzott realized there was a problem when Goldstrom saw Oss and looked at her with "terrified, black eyes, just the intention was not good." (N.T. Trial, 12/09/21, at 27). Goldstrom directed her to go inside the shop and when she looked outside of its window, she saw Oss lunge at Goldstrom with a silver blade in his hand. Goldstrom stepped backwards then "pulled out a firearm and shot," and they left the scene in a panic. (*Id.* at 30). Goldstrom threw his gun out of the car window as they crossed a bridge.

The testimony pertinent to whether Goldstrom had knowledge that his gun permit had been revoked is the testimony of Sergeant John Dixon of the Westmoreland County Sheriff's Office. He testified that the records check he conducted showed that Goldstrom's permit to carry a firearm had been revoked when a temporary Protection From Abuse (PFA) order was issued against him. A certified letter was sent to Goldstrom informing him of the revocation on May 11, 2020.[3] The Sherriff's Office received a receipt from the postal service indicating that the letter had been delivered to Goldstrom's address, and the signature block was signed by "M.S." (*Id.* at 65; *see also* Defendant's Exhibit MM, USPS Certified Mail Receipt for Goldstrom dated 5/13/20, marked "Delivered, Left with Individual"). Sergeant Dixon learned

---

[3] This is consistent with the prescribed notice provision stating that when a license to carry a firearm is revoked, notice of revocation "shall be sent by certified mail to the individual whose license is revoked." 18 Pa.C.S. § 6109(i).

through speaking with the postmaster that at the height of the COVID-19 pandemic, the postal service changed their practice to mark certified mail as delivered themselves instead of having the actual person served sign for it, and that when a letter is marked as delivered to a particular address, it means that it was given to an individual at the residence. The Sergeant also explained that when an individual's license to carry a firearm is revoked, the permit holder would need to contact his office to seek reinstatement, triggering a thorough review before a final decision on reinstatement is made. Sergeant Dixon testified that he is not aware of any documentation indicating that Goldstrom sought reinstatement of his license.

Regarding the firearms offense, Goldstrom maintained he had no knowledge that his license to carry a firearm had been revoked as part of a prior PFA proceeding. During opening statements at trial, defense counsel argued:

> When the PFA hit, part of the order — you will see it — was to turn all handguns either to the sheriff or to a third person, which he did. He gave it to his parents along with his license. The PFA was totally frivolous. A week or two, two and a half weeks later the PFA was fully dismissed. There was supposedly a notice from the sheriff from Westmoreland County telling him that his license was revoked based on the PFA that was dismissed. He never got it. He never signed for it. He had no idea about that. He carried his gun. After the PFA was dismissed he started carrying it again everyday, not special for this incident.

(N.T. Trial, 12/07/21, at 39-40).

At the charging conference before closing arguments, defense counsel requested the trial court instruct the jury with regard to the carrying a firearm

- 6 -

without a license offense that, "[Goldstrom] has to have knowledge it was revoked. He has to. You can't find culpability without that." (*Id.* at 106). Although the trial court acknowledged that it could "instruct them regarding knowingly" and that a scienter requirement "is logical,"[4] the Commonwealth objected to any modification of the standard instruction. (*Id.* at 106, 109). The trial court ruled that defense counsel could argue to the jury that Goldstrom had to have knowledge of the license revocation and noted that this *mens rea* requirement "makes perfect common sense," but nonetheless declined to adjust or supplement the standard instruction. (*Id.* at 109).

During closing argument, defense counsel again emphasized to the jury that Goldstrom lacked knowledge of the license revocation:

> Getting back to *mens rea*, Ladies and Gentlemen, you have to know you are committing a crime. It has to be intentional. That also applies for here. [Goldstrom] had to know his permit was revoked. . . . The only way he would know is to receive this letter and he didn't receive it. Look at it. That is not him. What MS whatever. There is no proof here beyond a reasonable doubt that he was served with a revocation letter from the sheriffs; knew or should have known that his license was revoked because he didn't.

(*Id.* at 138-139).

---

[4] **See** 18 Pa.C.S. § 302(c), **infra** (setting forth minimum culpability required in absence of specific *mens rea*, i.e., that a person acts "intentionally, knowingly or recklessly.").

The trial court then charged the jury in relevant part as follows on the carrying a firearm without a license and aggravated assault charges respectively, in accordance with the standard instructions:

> The defendant has been charged at Count 7 with carrying a firearm without a license. To find the defendant guilty of this offense, you must find that each of the following three elements has been proven beyond a reasonable doubt; first, that the defendant carried a firearm concealed on or about his person. The definition of firearm includes any pistol or revolver with a barrel less than 15 inches. To be a firearm the specific object charged must be operable. It is not disputed in this case that the object in this case was operable. Obviously it fired bullets. Next, the defendant was not in his place of abode, that is his home, or his fixed place of business. Third, that the defendant did not have a valid and lawfully issued license for carrying the firearm.

(*Id.* at 172-73).

\*   \*   \*

> If you find that the defendant used a firearm in committing or attempting to commit the acts constituting these violations of attempted murder or the **aggravated assault and that the defendant did not have a license to carry that firearm as required by law, you may regard that as one item of circumstantial evidence on the issue of whether the defendant intended to commit those crimes** as otherwise charged. It is for you to determine what weight — and remember by weight I mean the importance — what weight, if any, you will give to that item of circumstantial evidence. Evidence of non licensure alone is not sufficient to prove that the defendant intended to commit those offenses.

(*Id.* at 170).

After the court's closing instructions, defense counsel renewed his objection to the charge on the firearms offense and noted that while the standard instruction is typically appropriate, in this case, Goldstrom did have a license and that in order to find him guilty, "he had to have known it was

revoked . . . When the Jury reads the instructions, it is almost like strict liability . . . [Goldstrom] had to have *mens rea* in this case . . . he did have a permit and it was revoked, however, he had no knowledge of the same is something for [the jury] to decide." (*Id.* at 188-189). The Commonwealth again opposed any change and the trial court found, "your statement is logical but for some reason it is not contained in the standard instructions" and declined to modify them. (*Id.* at 189).

The jury acquitted Mr. Goldstrom of all charges relating to the shooting of Oss. As to Shook, the jury convicted Mr. Goldstrom of aggravated assault (causes bodily injury with a deadly weapon) and the lesser included offenses of simple assault and REAP. The jury additionally found Mr. Goldstrom guilty of CFWOL. On March 24, 2022, the trial court sentenced Goldstrom to 18 to 60 months of incarceration for aggravated assault, followed by 24 to 60 months for the firearms offense. Goldstrom filed post-sentence motions, which the trial court denied following oral argument.

Goldstrom timely complied with Rule 1925. *See* Pa.R.A.P. 1925(a)-(b). In its 1925(a) Opinion, the trial court addressed Goldstrom's contention that a *mens rea* instruction should have been given. It noted that 18 Pa.C.S. § 6109 had been complied with, in that notice was sent by certified mail to Goldstrom's address, and though he did not sign for the certified mail, which was not a requirement. It explained that it declined to depart from the standard jury instruction to include a provision requiring actual receipt or

knowledge of the revocation because it was for the jury to decide whether he had actual notice, given that the statutory notice had been provided; Goldstrom had given his firearm and his license to his parents per the PFA order; and he never sought to reinstate his license. (**See** Trial Court Opinion, 8/30/22, at 3-4).

The court also noted that while it did not depart from the standard jury instruction, it did give free rein to Goldstrom to argue non-receipt of notice to the jury which defense counsel did by arguing in both his opening and closing statements that Goldstrom was unaware that he receive the notice. It then concluded because Goldstrom never sought to reinstate his license, and because the notice of revocation was sent as the statute required, there was sufficient evidence from which the jury could find that Goldstrom knew that his license had been revoked. (**See id.**).

## II.

## A.

We begin by addressing Goldstrom's challenges to the sufficiency of the evidence, as a successful disposition would result in discharge on the pertinent crime. **See Commonwealth v. Spence**, 290 A.3d 301, 308 n.4 (Pa. Super. 2023).[5] Goldstrom first argues the evidence was insufficient to support the

---

[5]

     In determining whether the evidence was sufficient to support a defendant's conviction, we must review the evidence admitted

*(Footnote Continued Next Page)*

carrying a firearm without a license offense, based on the Commonwealth's failure to prove that he acted intentionally, knowingly or recklessly with respect to the element of non-licensure, where the evidence showed he had no notice or knowledge that his once valid license had been revoked. Goldstrom also maintains that his CFWOL conviction must be reversed where no notice of revocation was ever served on him and the Commonwealth's evidence on this point is speculative.

"In order to convict a defendant for carrying a firearm without a license, the Commonwealth must prove that the weapon was a firearm; that the firearm was unlicensed; and that where the firearm was concealed on or about the person, it was outside his home or place of business." **Commonwealth v. Muhammad**, 289 A.3d 1078, 1090 (Pa. Super. 2023) (citation omitted); **see also** 18 Pa.C.S. § 6106(a)(1). As will be discussed in detail **infra**, the

---

during the trial along with any reasonable inferences that may be drawn from that evidence in the light most favorable to the Commonwealth as the verdict winner. If we find, based on that review, that the jury could have found every element of the crime beyond a reasonable doubt, we must sustain the defendant's conviction. Further, a conviction may be sustained wholly on circumstantial evidence, and the trier of fact—while passing on the credibility of the witnesses and the weight of the evidence—is free to believe all, part, or none of the evidence. In conducting this review, the appellate court may not weigh the evidence and substitute its judgment for the fact-finder.

**Commonwealth v. Hummel**, 283 A.3d 839, 846 (Pa. Super. 2022) (citations omitted).

Commonwealth must establish that a defendant acted intentionally, knowingly or recklessly with respect to each element of Section 6106, including non-licensure. **See Scott**, **supra** at 291.

In this case, the evidence reflects through the testimony of Sergeant Dixon that notice of the license revocation was delivered to Goldstrom's residence by certified mail in accordance with the statutory mandate, and that an individual at that address accepted the letter. Although Goldstrom's signature itself was not on the mail receipt, the jury could reasonably infer that he was aware that his license to carry had been revoked since there is no dispute that the notice of revocation had been delivered to his residence, and that as part of the PFA proceeding, he was aware that he needed to seek reinstatement of his license to carry. Viewing the evidence in the light most favorable to the Commonwealth as verdict winner, **see Hummel**, **supra** at 846, the evidence was sufficient to establish that Goldstrom was aware of the license revocation. Accordingly, his first sufficiency challenge merits no relief.

**B.**

Goldstrom also disputes the sufficiency of the evidence supporting his aggravated assault, simple assault and REAP offenses. (**See** Goldstrom's Brief, at 55-64). Goldstrom contends that the Commonwealth failed to disprove that he acted in self-defense when he shot Shook once in the arm after he was confronted by multiple members of the Outlaws who had a

vendetta against him because he had left their motorcycle club to join the rival Pagan club.

A person is guilty of aggravated assault under 18 Pa.C.S. § 2702(a)(4) when he "attempts to cause or intentionally or knowingly causes bodily injury to another with a deadly weapon." A defendant is guilty of simple assault if he "attempts to cause or intentionally, knowingly or recklessly causes bodily injury to another." 18 Pa.C.S. § 2701(a)(1). The Crimes Code defines bodily injury as "impairment of physical condition or substantial pain." 18 Pa.C.S. § 2301. Lastly, if found guilty of REAP, the Commonwealth must prove that the defendant "recklessly engage[d] in conduct which place[d] or may [have] place[d] another person in danger of death or serious bodily injury." 18 Pa.C.S. § 2705.

Goldstrom maintains that he is not guilty of these offenses because he acted in self-defense, which is addressed in Section 505 of the Crimes Code:

**§ 505. Use of force in self-protection**

**(a) Use of force justifiable for protection of the person**.—The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.

**(b) Limitations on justifying necessity for use of force.**

\* \* \*

(2) The use of deadly force is not justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily injury, kidnapping or

- 13 -

sexual intercourse compelled by force or threat; nor is it justifiable if:

> (i) the actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or

> (ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating, except the actor is not obliged to retreat from his dwelling or place of work, unless he was the initial aggressor or is assailed in his place of work by another person whose place of work the actor knows it to be.

18 Pa.C.S. § 505(a)-(b)(2)(i)-(ii).

"If a defendant introduces evidence of self-defense, the Commonwealth bears the burden of disproving the self-defense claim beyond a reasonable doubt." *Commonwealth v. Steele*, 234 A.3d 840, 846 (Pa. Super. 2020) (citation omitted). The use of force against a person is justified "when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force" by the other person. 18 Pa.C.S. § 505(a). A self-defense claim is composed of three elements: "(1) the defendant reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (2) the defendant was free from fault in provoking the difficulty which culminated in his use of deadly force; and (3) the defendant did not violate any duty to retreat." *Steele*, *supra* at 846 (citation omitted).

In this case, the evidence was sufficient to disprove Goldstrom's claim of self-defense with regard to Shook, who he shot while he was running away. The jury considered the testimony of the witnesses and weighed it in conjunction with the video surveillance footage of incident, and was free to believe Shook's version of events instead of the defense theory of the case. Because Shook posed no threat to Goldstrom when Goldstrom shot him, the evidence does not support Goldstrom's claim of self-defense with regard to the charges and he was not justified in shooting Shook to protect himself. Viewed in the light most favorable to the Commonwealth, the evidence was sufficient to sustain Goldstrom's convictions for aggravated assault, simple assault and REAP.

## III.

## A.

We next turn to Goldstrom's issues concerning the trial court's jury instructions. Goldstrom first contends that the trial court erred in failing to issue any *mens rea* instruction to the jury with respect to the non-licensure element of the carrying a firearm without a license offense.[6] Goldstrom points to this Court's decisions in **Scott** and **Arnold**, **supra**, in support of his position

---

[6] "Our standard of review when considering the denial of jury instructions is one of deference – an appellate court will reverse a court's decision only when it abused its discretion or committed an error of law." **Commonwealth v. Sebolka**, 205 A.3d 329, 342 (Pa. Super. 2019) (citation omitted).

that the standard instruction was inadequate and should have been modified or supplemented given his defense of lack of knowledge of his license revocation. (**See** Goldstrom's Brief, at 28-43). We agree.

In reviewing a challenge to jury instructions, we do not "rigidly inspect a jury charge, finding reversible error for every technical inaccuracy, but rather evaluate whether the charge sufficiently and accurately apprises a lay jury of the law it must consider in rendering its decision." **Commonwealth v. Johnson**, 289 A.3d 959, 1002 (Pa. 2023) (citation omitted). Additionally, the trial court "may use its own expressions of the law, so long as the concepts at issue are accurately presented." **Id.** (citation omitted). The Suggested Standard Jury Instructions are not binding and are guides only for courts to use in crafting appropriate jury instructions. **See Commonwealth v. Simpson**, 66 A.3d 253, 274 n.24 (Pa. 2013).

In this case, Goldstrom maintains that the element of non-licensure requires a culpable mental state and that the jury should have been instructed accordingly. In **Scott**, this Court considered whether the Commonwealth must establish *mens rea* for the element of concealment in order to obtain a carrying a firearm without a license conviction under Section 6106, although the statutory language does not include an express scienter requirement with respect to any of its elements. The Court observed that our Supreme Court has held that "[section] 302 provides the default level of culpability where a

criminal statute does not include an express *mens rea*." **Scott**, **supra** at 290

(citing **Commonwealth v. Moran**, 104 A.3d 1136, 1149 (Pa. 2014)).

Section 302(c) of the Crimes Code states:

(c) **Culpability required unless otherwise provided.—**When the culpability sufficient to establish a material element of an offense is not prescribed by law, such element is established if a person acts intentionally, knowingly or recklessly with respect thereto.

18 Pa.C.S. § 302(c).

The **Scott** Court explained that strict liability offenses are generally disfavored, and a statute will not be interpreted to dispense with a *mens rea* requirement absent indicia of legislative intent to do so. **See Scott**, **supra** at 291. It held with regard to Section 6106 that because there is no indication the legislature intended to impose strict liability for the crime, "the Commonwealth must establish that a defendant acted intentionally, knowingly or recklessly **with respect to each element**" of Section 6106. **Id.** (citation omitted; emphasis added).

This Court's more recent decision in **Arnold**, **supra**, is also instructive. In that case, we examined the offense of Contraband,[7] which does not include

---

[7] Section 5123 of the Crimes Code defines the offense of Contraband as follows:

A person commits a felony of the second degree if he sells, gives, transmits or furnishes to any convict in a prison, or inmate in a mental hospital, or gives away in or brings into any prison, mental hospital, or any building appurtenant thereto, or on the land

*(Footnote Continued Next Page)*

an express scienter requirement, and the constitutionality of the court's use of the standard instruction defining the offense to the jury. After noting that the concept of due process includes a degree of protection against the imposition of criminal liability without criminal intent on the part of the defendant, the **Arnold** Court determined that the offense contains a default *mens rea* of recklessness provided by Section 302(c) in the absence of an express scienter requirement. **See Arnold**, **supra** at 1275. The Court then addressed the trial court's issuance of only the standard jury instruction for the offense without any supplemental *mens rea* guidance for the jury, over the objection of defense counsel. The Court ascertained no defect in the standard instruction itself, but nonetheless found reversible error and held:

> The constitutional defect in this case stemmed not from the court's reading the standard instruction for the offense to the jury but, instead, **from the trial court's omission of an**

---

granted to or owned or leased by the Commonwealth or county for the use and benefit of the prisoners or inmates, or puts in any place where it may be secured by a convict of a prison, inmate of a mental hospital, or employee thereof, any controlled substance included in Schedules I through V of the act of April 14, 1972 (P.L. 233, No. 64), known as The Controlled Substance, Drug, Device and Cosmetic Act, (except the ordinary hospital supply of the prison or mental hospital) without a written permit signed by the physician of such institution, specifying the quantity and quality of the substance which may be furnished to any convict, inmate, or employee in the prison or mental hospital, the name of the prisoner, inmate, or employee for whom, and the time when the same may be furnished, which permit shall be delivered to and kept by the warden or superintendent of the prison or mental hospital.

18 Pa.C.S. § 5123(a).

**accompanying instruction relaying the default _mens rea_ from Section 302(c) and/or from the trial court's failure to issue a [supplemental] instruction given the nature of Appellant's testimony**. Because of the trial court's error in issuing a jury instruction for Section 5123(a) without also defining the default _mens rea_ provided by Section 302(c), Appellant is entitled to a new trial for that offense.

_Id._ at 1276 (case citation omitted).

In this case, the Commonwealth was required to establish that Goldstrom had actual notice that his license to carry a firearm had been revoked, which may be proven by a collection of facts and circumstances that allow the fact finder to infer that a defendant has knowledge of suspension. _See Commonwealth v. Kane_, 333 A.2d 925 (Pa. 1975); _Commonwealth v. Crockford_, 660 A.2d 1326, 1330-31 (Pa. Super. 1995). While Goldstrom's counsel was permitted to argue to the jury that Goldstrom did not have actual knowledge that his license had been revoked, that was not a substitute for the trial court giving a _mens rea_ jury instruction.

As in _Arnold_, we conclude the trial court's lack of instruction on _men rea_ sufficiently tainted its jury charge to a degree that a new trial is warranted on the firearms offense. The defense presented a clear theory that Goldstrom was never served with notice that his once-valid concealed carry license had been revoked. Consistent with this defense, counsel repeatedly asked the trial court to instruct the jury on a scienter element, but the court declined to do so in spite of its acknowledgment that this request was logical and made common sense. In reading the standard instruction without any

accompanying guidance on a minimum culpability requirement as provided by Section 302(c), the court relieved the Commonwealth of its obligation to establish *mens rea* and removed from the jury's consideration Goldstrom's only defense to the offense. We, therefore, vacate Goldstrom's judgment of sentence for the carrying a firearm without a license conviction.

**B.**

In a related issue, Goldstrom contends the trial court's use of the standard jury instruction for the aggravated assault charge, which included a permissive inference arising from his use of a firearm without a license to carry, was also legally deficient. Goldstrom argues that while the instruction is correct on its face, its use in this case was tainted by the trial court's erroneous omission of a *mens rea* requirement from the jury charge on the firearms offense. (**See** Goldstrom's Brief, at 43-48; **see also supra** at *8 (trial court's instruction permitting jury to regard Goldstrom's use of a firearm without a license to carry as circumstantial evidence of his intent to commit aggravated assault)). We agree.

We first note that "[i]nferences and presumptions are staples of our adversary system of factfinding" and can be either mandatory or permissive in nature. **Commonwealth v. Hall**, 830 A.2d 537, 544 (Pa. 2003) (citation omitted). A mandatory presumption "tells the trier of fact that he must find the elemental fact upon proof of the basic fact." **Id.** (citation omitted). In contrast, a permissive inference allows but does not require the factfinder to

infer the elemental fact from proof of the basic fact, and the basic fact may constitute *prima facie* evidence of the elemental fact. ***See id.***

In ***Commonwealth v. Sattazahn***, 631 A.2d 597 (Pa. Super. 1993), this Court explained the reasoning for use of a permissive inference in the context of a defendant's carrying of an unlicensed firearm in the commission of another crime:

> We [] find a rational connection between the licensing or failure to license a firearm and the intent with which a person acts in using that firearm. The legislature has recognized a distinction between prohibited offensive weapons which have no peaceful purpose and shall not be allowed to exist in our society, and those which have peaceful as well as lethal possibilities. The former are banned absolutely because criminal usage is conclusively presumed, while the latter are allowed, if licensed. The obtaining of a license is tantamount to an acknowledgment that the possession is for lawful purposes; the failure to obtain a license suggests the opposite. One who envisions no criminal purpose for the firearm is unlikely to refuse, if required, to declare his ownership of that weapon to the proper authorities, while one who harbors criminal intentions will. This is not to say that in every instance the lack of a license suggests criminal intent, but rather that a lack of required license is simply another piece of circumstantial evidence from which the true intent of the user of a firearm might be ascertained in a given situation.
>
> Although this case involves whether Appellant had a license to carry the firearm, rather than a license merely to own the firearm, the same reasoning is sound in reaching the result that there is a rational connection between the licensing and the intent to commit criminal acts with that firearm.

*Id.* at 606, n.6 (citation omitted).

In this case, because the trial court did not instruct the jury to evaluate whether Goldstrom acted intentionally, knowingly, or recklessly with respect to non-licensure, the jury was deprived of the opportunity to meaningfully

- 21 -

consider whether his use of a firearm without a license to carry as circumstantial evidence of his intent to commit aggravated assault and, if so, what weight to assign it as circumstantial evidence. Because the trial court's legally deficient instruction to the jury concerning the firearms offense tainted the jury's deliberation and determination of Goldstrom's guilt as to aggravated assault, he is entitled to a new trial for this offense.

Judgment of sentence vacated. Simple Assault and REAP convictions affirmed. Case remanded for a new trial on the aggravated assault and carrying a firearm without a license offenses. Jurisdiction relinquished.

PJE Bender joins the memorandum.

Judge Stabile concurs in the result.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/5/2023