**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MICHAEL S. ZERNELL | : | |
| | : | |
| Appellant | : | No. 578 WDA 2022 |

Appeal from the Judgment of Sentence Entered November 4, 2021
In the Court of Common Pleas of Jefferson County Criminal Division at
No(s): CP-33-CR-0000364-2020

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MICHAEL S. ZERNELL | : | |
| | : | |
| Appellant | : | No. 579 WDA 2022 |

Appeal from the Judgment of Sentence Entered November 4, 2021
In the Court of Common Pleas of Jefferson County Criminal Division at
No(s): CP-33-CR-0000616-2020

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MICHAEL S. ZERNELL | : | |
| | : | |
| Appellant | : | No. 580 WDA 2022 |

Appeal from the Judgment of Sentence Entered November 4, 2021
In the Court of Common Pleas of Jefferson County Criminal Division at
No(s): CP-33-CR-0000363-2020

J-A06044-23

BEFORE: OLSON, J., NICHOLS, J., and PELLEGRINI, J.*

MEMORANDUM BY PELLEGRINI, J.:                    **FILED: MARCH 8, 2023**

In these consolidated cases, Michael S. Zernell (Zernell) appeals from the judgment of sentence imposed by the Court of Common Pleas of Jefferson County (trial court) following his jury conviction of multiple sexual offenses against his stepdaughters, A.C. and K.C. Zernell challenges the sufficiency of the evidence supporting his conviction for Criminal Solicitation of Statutory Sexual Assault of A.C. and contests the weight of the evidence supporting the numerous charges relating to K.C.—Criminal Attempt Statutory Sexual Assault, two counts of Involuntary Deviate Sexual Intercourse with a Child (IDSI), Aggravated Indecent Assault of a Child, two counts of Indecent Assault Person Less Than 13 Years of Age, and one count of Indecent Assault Without Consent.[1] We affirm.

## I.

This case arises from Zernell's solicitation of A.C. for sex and from his sexual abuse of K.C. when they were about 15 and 10-11 years old,

---

* Retired Senior Judge assigned to the Superior Court.

[1] **See** 18 Pa.C.S. §§ 902(a), 3122.1(b), 901(a), 3123(b), 3125(b), 3126(a)(7) and 3126(a)(1). This appeal involves Zernell's conviction at Docket No. 578 WDA 2022. He was convicted of several other offenses at the two additional dockets numbers, including fleeing or attempting to elude police.

respectively, while Zernell was married to their mother, A.Z. (Mother).[2] Mother has four children and Zernell has two children, but they have no biological children together. The trial court held a two-day jury trial in June 2021 and several witnesses testified, including A.C., who was 17 years old at that time and K.C., who was 14.

A.C. testified that Mother and Zernell became romantically involved when she was in fourth grade and they lived together continuously from 2014 until February 2020. A.C. recounted regarding the solicitation offense that on May 23, 2019, while she and Zernell were driving to a hockey game, he "stated to me that if I ever wanted to have safe sex, I was able to do so with him as long as I did not tell my mother." (N.T. Trial, 6/17/21, at 198, 201). Zernell explained that sex with him would be safe because it would not result in pregnancy, as he had a vasectomy. A.C. told Zernell that she was not interested in this at all, that it would not happen, and she asked that he not talk about it again.

A.C. also testified that during the time leading up to this incident, Zernell had inappropriately touched her numerous times as she emptied the dishwasher at the house and would "hold onto my lower hip and butt area" as he moved closely around her. (*Id.* at 202). Although A.C. told him that this made her very uncomfortable and asked him to stop every time, he continued

_____

[2] Mother and Zernell were separated at the time of trial.

to do this about twice per week. Additionally, when Zernell purchased something for A.C. or did something nice, he would tell her "that I owed him . . . [and] would give examples such as doing extra chores or . . . a blow job or a hand job." (**Id.** at 204-05). When Zernell made these types of comments, A.C. would respond by telling him "No" and that this made her uncomfortable and is inappropriate because he is a "father figure" to her. (**Id.** at 205-06).

On cross-examination, A.C. acknowledged that Zernell did not take further action after she said "No" each time and that she did not inform Mother of the incidents. A.C. explained that Zernell was able to easily manipulate Mother and "made it known to me that if I did tell my mother . . . she would not believe me and that I was just trying to ruin their relationship." (**Id.** at 207).

A.C. elaborated on re-direct examination that she was fearful Mother would not believe her because her biological father was in prison for sexual abuse offenses against her older sister, and Mother would not believe this had happened in the family again. A.C. was also afraid because she had nowhere to live other than with Mother and Zernell.

Mother testified that K.C. has been diagnosed with a learning disability, ADD, anxiety and depression, and that she has difficulty expressing herself and describing events cogently in chronological order. Mother explained that

while she was at work on the morning of February 12, 2020, K.C. sent her an email from school that read:

> First I want to say is, do not show [Zernell] this message. You will understand at the end why I don't want you to show him. On Sunday, I was downstairs in the basement working with [Zernell] on the boards, and I asked him what I can do so that I can go over to [her friend H.H.'s] house. He said, 'You will have to have sex with me.' And I just ignored him. Then he pushed me hard —then he pushed me not hard to the fridge, and I won't let him do it. This happened way before you came downstairs to the basement, and then I ended up leaving. Plus he touched me inappropriately before. Love [K.C.]

(*Id.* at 55-56; Commonwealth's Exhibit 1).

Mother left work to confront Zernell and when she pulled into their driveway, she "used the OnStar app to unlock his truck because I knew that he had a pistol and . . . I didn't want him to have access to it in the situation." (*Id.* at 59). Zernell denied the allegations, but Mother told him that she was obligated to report it. Zernell then implied that he was going to "take care of it" by committing suicide and left the house in his truck. Mother called 911 because she was afraid Zernell was going to hurt himself.

Mother recounted that she had been concerned about K.C. before this incident because "there were times where [K.C.] and [Zernell] would not be seen for awhile and I just felt like that was odd." (*Id.* at 65). A few weeks before this, when Mother went into her bedroom, she observed Zernell lying in bed under the covers with K.C. watching TV while Zernell was wearing underwear only. Mother recalled firmly telling Zernell that this was

inappropriate and her level of vigilance rose when he and K.C. were together in the house.

Mother testified that the weekend before K.C. reported the abuse, Mother noticed that Zernell and K.C. were in the basement and she went down the steps to check on them. She observed K.C. standing near a deep freezer with [Zernell] standing a few feet behind her and they vaguely explained that they were working on a project. Mother grew suspicious at this because they were not actively working with any tools or materials.

K.C. testified that she built up the confidence to write the email to Mother after her best friend H.H. encouraged her to report the abuse, even though she was very worried about what would happen next. K.C. recounted that on February 8, 2020, she had a conversation with Zernell through text message asking for permission to go to H.H.'s house, and he replied that she could not because she was grounded. K.C. offered to clean the house in order to go and Zernell responded that "cleaning won't do it" and they would talk about it later. (N.T. Trial, 6/18/21, 20). That afternoon, they went to the basement to work on a wood project and she asked, "Why can't I go to [H.H.'s house], something like that. . . . I remember after a while he said, 'There is one thing you can do, and that is to have sex with me.' And I said no. And I don't remember how he placed his hands on me. But he rotated me." (*Id.* at 25). Zernell grabbed K.C. and moved her towards a very small space next to a tall freezer and he "tries pulling down my pants. And I pull up my pants

and hurry up and turn back around and move back away from him." (*Id.* at 27). Zernell then stopped trying to touch her, they went back to wood working, and Mother came into the basement.

K.C. testified to an earlier instance when she was about ten years old, although she could not pinpoint her exact age, that occurred when Mother and her sister were not home. K.C. testified that while she was on the couch playing video games, "[Zernell] licked my privates. I'm not a hundred percent sure if he did put his fingers in my vagina or not" at that time, but that he had done this to her in the past. (*Id.* at 34).

K.C. recounted another instance wherein she was watching a hockey game with Zernell in the bedroom he shared with Mother and that he was under the covers wearing only underwear. K.C. could not recall how old she was at that time, but she testified that she was definitely under the age of 13. Zernell placed his hand on her hand, put it on his penis moving it up and down, licked her vagina and touched her breasts. K.C. testified that Zernell touched her inappropriately "a lot of times" and estimated that there were more than 15 episodes, stating that the abuse began when she "was really young," about six to eight years old, although she was unsure of her exact age. K.C. also described an instance she found disturbing where Zernell asked her, "If someone had a gun up to your mom's head and told you to show a body part, which would you show?" (*Id.* at 45). When she stared at him in disbelief, he said, "Boom. Your mother's dead." (*Id.*). K.C. testified that while she was

showering, Zernell would often come into the bathroom without her consent. She recounted that while using an old cell phone she found in the house, she came across a video recording showing A.C. naked in the shower and Zernell setting up the cell phone to make the recording.

On cross-examination regarding the details of the incident that occurred in the basement, K.C. acknowledged that she initially told police that Zernell stopped trying to have sex with her when Mother came down the stairs, and that this differed from her trial testimony, where she had indicated that there was a time gap between when Zernell stopped and when Mother entered the basement. As to the earlier incident on the couch, when defense counsel noted that the "sequence of events was a little bit different" in K.C.'s forensic interview compared to her trial testimony, she stated that her initial interview "is more accurate because I remember more than what I do now. Some things I remember more because I have flashbacks." (*Id.* at 67). As to the bedroom incident, K.C. did not remember the time of day that it took place and was unable to recall certain details because she is "still missing a part of that memory." (*Id.* at 78). K.C. also acknowledged that her biological father is in prison for sexual abuse offenses against her older sister, and she explained that although she generally tells Mother "everything," she did not inform her of the abuse because she was very young and scared. (*Id.* at 81).

H.H. testified that K.C. did not go to her birthday party in February 2020 and that K.C. told her it was because "[Zernell] said she'd only come if she

had sex with him." (N.T. Trial, 6/17/21, at 40). H.H. repeatedly encouraged K.C. to report the incident to Mother or a guidance counselor.

Corporal Timothy Butler of the Pennsylvania State Police testified that on February 12, 2020, he responded to a call to conduct a welfare check of Zernell and police located him through OnStar. Zernell ignored police signals that he stop and led several officers on a low-speed chase lasting over an hour. The chase ended when an officer forced Zernell's vehicle off the roadway and he hit a tree. Zernell had blood on his wrists and hands, two pocketknives with suspected blood on them in the vehicle, along with what appeared to be suicide notes addressed to his children and Mother.

The jury found Zernell guilty of the above-listed offenses on June 18, 2021. On November 4, 2021, the trial court sentenced him to an aggregate term of not less than 37½ nor more than 80 years of incarceration. Zernell filed a post-sentence motion challenging the sufficiency and weight of the evidence concerning the sexual offense charges, which the trial court denied by order and opinion entered March 11, 2022. Zernell timely appealed and he and the trial court complied with Rule 1925. *See* Pa.R.A.P. 1925(a)-(b).

**II.**

**A.**

Zernell first challenges the sufficiency of the evidence supporting his conviction of Criminal Solicitation of Statutory Sexual Assault concerning A.C.[3] Zernell contends that his statement to A.C. in the car did not encourage, request or command sex with him and "to the contrary [was] informational only." (Zernell's Brief, at 17; *see id.* at 13-19).

Under Section 902 of the Crimes Code, "A person is guilty of solicitation to commit a crime if with the intent of promoting or facilitating its commission he commands, encourages **or** requests another person to engage in specific conduct which would constitute such crime or an attempt to commit such

---

[3]

> A claim challenging the sufficiency of the evidence is a question of law. In determining whether the evidence was sufficient to support a defendant's conviction, we must review the evidence admitted during the trial along with any reasonable inferences that may be drawn from that evidence in the light most favorable to the Commonwealth as the verdict winner. If we find, based on that review, that the jury could have found every element of the crime beyond a reasonable doubt, we must sustain the defendant's conviction. Further, a conviction may be sustained wholly on circumstantial evidence, and the trier of fact—while passing on the credibility of the witnesses and the weight of the evidence—is free to believe all, part, or none of the evidence. In conducting this review, the appellate court may not weigh the evidence and substitute its judgment for the fact-finder.

*Commonwealth v. Hummel*, 283 A.3d 839, 846 (Pa. Super. 2022) (citations omitted).

crime or which would establish his complicity in its commission or attempted commission." 18 Pa.C.S. § 902(a) (emphasis added). "The purpose of the solicitation statute is to hold accountable those who would command, encourage, or request the commission of crimes by others." ***Commonwealth v. Hacker***, 15 A.3d 333, 336 (Pa. 2011). Regarding the element of intent, there must be an "intent to accomplish the **acts** which comprise the crime, not necessarily with intent specific to all the **elements** of that crime." ***Id.*** (emphasis in original). Encouragement and intent to accomplish the acts is sufficient evidence to sustain a solicitation conviction. ***See id.***

Instantly, the crime underlying Zernell's solicitation conviction is Statutory Sexual Assault, defined as follows: "A person commits a felony of the first degree when that person engages in sexual intercourse with a complainant under the age of 16 years and that person is 11 or more years older than the complainant and the complainant and the person are not married to each other." 18 Pa.C.S. § 3122.1(b).

Here, the evidence was sufficient to establish Zernell's intent to solicit the act of statutory sexual assault with then 15-year-old A.C. His suggestion to A.C. that they have safe sex showed his encouragement of and intent to engage in sexual intercourse with her. Contrary to Zernell's characterization of his comments as merely "informational" in nature, the remarks, when viewed in the context of the record as a whole, which included his prior sexual grabbing of/pushing against A.C., clearly communicated his desire to have

sexual intercourse with her and were designed to bring about that act. Viewing the evidence in the light most favorable to the Commonwealth as verdict winner, we conclude that it presented sufficient evidence to support Zernell's conviction.

**B.**

Zernell next challenges the weight of the evidence[4] supporting his conviction of the numerous sexual offenses against K.C. Zernell asserts K.C.'s

_____

[4]

A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. It has often been stated that a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail. An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that

*(Footnote Continued Next Page)*

testimony shows that she has a "variable memory" of the alleged instances of sexual abuse that amounts to much more than a few minor inconsistencies.[5] (Zernell's Brief, at 25; *see id.* at 20-30). Zernell points to perceived discrepancies between K.C.'s initial reports to authorities and her trial testimony, her lack of ability to remember specific details of the incidents, and he argues that when viewed as a whole, her testimony was "so unreliable that a guilty verdict is a shock to anyone's conscience." (*Id.* at 30).

We first observe that issues of witness credibility include questions of inconsistent testimony. *See Commonwealth v. Jacoby*, 170 A.3d 1065, 1080 (2017). It is well-settled that the jury is entitled to resolve any inconsistencies in the Commonwealth's evidence in the manner that it sees fit and is free to believe all, part, or none of the evidence." *See id.*

In this case, K.C. testified that Zernell sexually abused her when other family members were in a different part of the house or out of the home, and she described in detail the ordeal of the abuse, starting when she was very

---

> the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Sebolka*, 205 A.3d 329, 340–41 (Pa. Super. 2019) (citations and quotation marks omitted).

[5] We note that IDSI with a Child, a lead charge in this case concerning K.C., is defined as: "A person commits involuntary deviate sexual intercourse with a child, a felony of the first degree, when the person engages in deviate sexual intercourse with a complainant who is less than 13 years of age." 18 Pa.C.S. § 3123(b).

young and lasting for years. K.C. maintained that she did not inform Mother of the abuse because she was young at the time and was afraid of what might happen. Although K.C. readily recognized that was she unsure of certain details, she made it equally clear that she was sure of the sexual abuse perpetrated by Zernell. The Commonwealth also established through the testimony of Mother that K.C. had learning disabilities and difficulty articulating events in chronological order.

The credibility of K.C.'s testimony was corroborated by that of A.C., who described Zernell's attempts to engage in sexual acts with her despite her refusals; Mother's testimony describing the concerning behavior she had observed, including Zernell lying in bed under the covers with K.C. wearing only underwear; and H.H., to whom K.C. confided, precipitating K.C.'s report of the abuse. Further, when Mother confronted Zernell with the allegations, he immediately fled and drove his vehicle recklessly for over one hour in an attempt to elude police officers, thus demonstrating his consciousness of guilt. *See Commonwealth v. Clark*, 961 A.2d 80, 92 (Pa. 2008) (flight after commission of crime is evidence of consciousness of guilt).

Although at trial defense counsel highlighted various alleged inconsistencies in K.C.'s accounts of the abuse since her initial disclosure, the jury, as fact-finder, heard and weighed her testimony, and was free to credit it and to resolve any inconsistencies in the Commonwealth's favor. Assessing all of the evidence according to the governing principles cited above, we

cannot conclude that the trial court abused its discretion when it concluded that the jury's verdict did not shock its sense of justice. Consequently, Zernell's weight claim fails.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/8/2023